**In re COMBUSTION ENGINEERING, INC., Debtor.**

**No. 03–10495 JKF.**

United States Bankruptcy Court, D. Delaware.

June 23, 2003.

Curtis A. Hehn, Laura Davis Jones, Michael Paul Migliore, Pachulski, Stang, Ziehl, Young & Jones, Wilmington, DE, for Debtor.

Michael R. Lastowski, Richard W. Riley, William K. Harrington, Duane Morris, LLP, Wilmington, DE, for Official Committee of Unsecured Creditors.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CORE MATTERS AND PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW AND RECOMMENDATIONS TO THE DISTRICT COURT WITH RESPECT TO NON–CORE MATTERS

JUDITH K. FITZGERALD, Chief Judge.

The matter before the court is the approval of Combustion Engineering, Inc.'s ("Debtor" or "CE") Disclosure Statement and confirmation of its prepackaged Plan. Throughout the course of the hearings on the Disclosure Statement and Plan, the Plan was modified in several respects and many objections to Plan confirmation were resolved. Regarding the Disclosure Statement, there were objections but the par-

ties took depositions, looked at documents and had the opportunity to further explore issues at a meeting that was held in Houston, Texas. A Committee was appointed and also performed due diligence. The information provided through all these avenues satisfied the Committee, and this Court is satisfied, that there was sufficient information in the Disclosure Statement to provide "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." [1] 11 U.S.C. § 1125(a)(1). The Plan has been modified through the course of the trial but that fact does not affect the adequacy of the Disclosure Statement, although it no longer matches the Plan in all respects. All constituencies were represented in court and either have agreed to the changes or their objections to the Disclosure Statement have been overruled. The Disclosure Statement contained adequate information to enable the impaired creditors (Classes 5, 6, and 7), to vote on the Plan. Class 5 (Asbestos PI Trust claims) voted in favor of the Plan. Class 6, the Non–Debtor Affiliate Intercompany claims, is impaired (but there are no claims in this class), and Class 7, Equity, voted in favor of the Plan. The Disclosure Statement is approved.

However, I recommend that confirmation of the Plan as modified through June 4, 2003, be withheld and that an opportunity be provided to the Plan Proponents to submit additional information regarding ABB Lummus Global, Inc. ("Lummus") and Basic, Inc., affiliates of Debtor, so that the Plan may be confirmed. There are two issues, which will be addressed later in more detail concerning a § 105(a) injunction, the first concerning notice to and votes by Lummus' creditors and Basic's creditors. I acknowledge that an advertisement was placed in the Wall Street Journal but the testimony is unclear what Debtor did to identify independent claimants of Lummus and Basic. I recommend that the Debtor be provided an opportunity to file an affidavit and produce a witness for a trial deposition on cross-examination with respect to what if any effort was made to identify, notify and solicit votes from creditors with claims against only Lummus and not shared with CE and against only Basic and not shared with CE. The testimony established that Lummus and Basic creditors culled from *CE's records* voted. The testimony does not establish whether Lummus' records and Basic's records were utilized to develop the notice list. I recommend withholding confirmation until such an affidavit and deposition transcript are filed and if they do not establish some direct notice to those holding non-derivative claims against Lummus and Basic, I recommend that Debtor be required to notify and solicit the direct Lummus and Basic creditors before confirmation is approved.

The second issue concerns payments to Lummus and Basic direct creditors. I find that although David Austern, the Futures Representative, testified that he would serve as the Futures' Representative for both Lummus and Basic and that there is a separate "pot" of money for CE and a

---

1. The existence of insurer indemnities was not in the Disclosure Statement and Mr. Austern was concerned about that but the issue was resolved when insurer claims were taken out of Class 5 (Asbestos PI Trust claims) and put in Class 4 (general unsecured claims) or Class 3 (workers' compensation). The claimants affected were represented at the trial so there is not a Disclosure Statement issue with respect to this point.

separate pot for Lummus and a separate pot for Basic, there are no documents filed of record to support the existence of the separate funds. I also accept Mr. Austern's testimony that contribution into these separate pots provides such a significant ratio of funds available to pay claims that the Plan can be confirmed as these amounts will provide the opportunity to pay any non-accepting creditor of Lummus or Basic. This is needed because all shared insurance will pay only CE's creditors, not those of Lummus or Basic. However, the CE Trust Distribution Procedure document provides that it "does not address Basic Asbestos Personal Injury Claims, Basic Derivative Asbestos Personal Injury Claims, Lummus Asbestos Personal Injury Claims, or Lummus Derivative Asbestos Personal Injury Claims." Furthermore, the Asbestos PI Trust Agreement provides that TDP "procedures will subsequently be adopted respecting" the Basic and Lummus "Asbestos Trust Claims".

I recommend that confirmation be withheld to give the Debtor an opportunity to file appropriate document(s) that will establish the funds and the distribution processes for Lummus and for Basic.

Except where specifically noted to the contrary, I accept and adopt as my findings all of the evidence summarized below. Objections to the Plan were filed by numerous parties. All have been resolved except those of the "Certain Cancer Claimants" ("CCC") and certain non-participating insurers. Because the Plan has been amended several times as these proceedings occurred, I believe it will be more instructive to deal with the objections and the evidence collectively, rather than to separate out each objection. I overrule all objections to core matters and recommend that the District Court do likewise as to all non-core matters except with respect to the injunction as to Lummus and Basic, until the supplemental documents are filed. I have attempted to include all of the findings I agreed to place into the findings or the Order at various times throughout the trial and arguments. If I failed to include any, it is through inadvertence and I ask the parties to direct me to the appropriate transcript references for my reconsideration.

CE filed its petition under chapter 11 on February 17, 2003, with a Disclosure Statement and Plan. On the date of filing, CE was a wholly owned subsidiary of Asea Brown Boveri, Inc. ("US ABB"). ABB Limited is the ultimate parent of U.S. ABB and CE. *See* CE Conf. Hrg. Exh. 111a (illustrating corporate structure of the ABB Group). The combined hearing on the Disclosure Statement and Plan of reorganization was held on April 24, May 1, May 2, May 12, May 13, May 23, May 27 and June 3, 2003. The evidentiary portions occurred on April 24, May 1, May 2, May 12 and May 13. Arguments and motions were heard on the other dates.

CE's asbestos problems began in the mid–1960s [2] and the number of asbestos claims increased through the years but did not have a material effect until the mid–1990s. As of the date of the filing of the bankruptcy it had approximately $198 million in face amount of available insurance; however, certain carriers dispute coverage. Before the mid–1990s approximately two-

---

**2.** CE has also been sued as successor-in-interest to some of the companies it acquired. By the mid–1970s it was subject to a few hundred asbestos claims a year but there was no noticeable impact on its financial health until the mid–1990s. Since 1989 there has been a dramatic increase in asbestos-related claims filed against CE and there are currently approximately 160,000 asbestos personal injury claims and five asbestos-related property damage claims against CE and its affiliates.

thirds of asbestos payments made by CE were reimbursed by insurance. Since then available insurance proceeds have declined. In 2001 and 2002 some insurers took the position that only about one-third of CE's asbestos liability payments were reimbursable. From 1990 to 2002 CE paid $950 million in asbestos claims of which only $517 million was reimbursed or reimbursable by carriers. These factors left CE unable to pay its asbestos obligations without significant capital contributions from its parent, U.S. ABB, which it obtained. In and after May 2000 U.S. ABB contributed $482 million to CE in the form of $100 million cash so that CE could pay the uninsured portion of its asbestos liabilities and approximately $400 million in a note. In May of 2000 U.S. ABB contributed another $200 million in cash to CE and in March, 2002, another $200 million in cash. *See* Brett Affidavit at ¶ 21. CE has exhausted its primary insurance coverage for products liability or has settled with its primary carriers and its excess insurers are disputing liability.

By the fall of 2002 CE had no source of liquidity absent funding from ABB and ABB's financial problems were exacerbated by CE's asbestos liability. Beat Hess, ABB Limited's general counsel, testified that if the banks had not been prepared to refinance the ABB $1.5 billion debt that was due mid-December of 2002, ABB would be "bankrupt". NT 4/24/03 at 224 (Hess). Further, if ABB and U.S. ABB could not refinance, CE would not have been able to access the $402 million note on which U.S. ABB was obligated to CE. *Id.* at 230. This note was one of CE's more significant assets.

There is no dispute that unless something was done about CE's asbestos liabilities and soon, ABB's access to financing would be terminated and that ABB's financing was and is critical to CE's liquidity.

US ABB acquired CE's stock in 1990[3] but the acquisition was not successful in light of the capital infusions required to maintain CE's solvency. NT 4/24/03 at 218 (Hess). During the 1990s the ABB group underwent rapid growth through acquisition of companies related to the power technology business. By early 2002 it was one of the world's largest power technology companies and had become known as the "GE of Europe". By that time also it was facing crushing debt with respect to the acquisitions. On December 15, 2002, $1.5 billion repayment was due and another $2.1 billion is due sometime in 2003. Due to a debt downgrade, ABB Limited's historical sources of liquidity were no longer available. The huge debt coupled with reduced demand and CE's rising asbestos liabilities threatened ABB's survival. Indeed, ABB Limited's lenders insisted that it find a resolution to the problem of CE's asbestos liabilities before they would lend it any more money. Further, creditors were voicing an inclination to institute an involuntary bankruptcy against U.S. ABB. Beat Hess, ABB Limited's general counsel, testified on direct that as long as there are asbestos liabilities within the ABB group, its credit facility would run out and it could not repay debt. NT 4/24/03 at 245–46 (Hess).

In order to resolve its financial problems, ABB began a divestment and restructuring plan.[4] The divestment pro-

---

**3.** The acquisition was by way of a leveraged buyout for $1.6 billion. Between 1990 and 1995 CE sold 32 businesses to abate losses but during the 1990s it lost more than $1.3 billion. It operated its nuclear power division until 1999 and continued to manufacture air pre-heater facilities, coal pulverizers and other heat exchange facilities.

**4.** Joseph J. Radecki, Jr., an investment banker at CIBC World Markets Corp., testified in

gram cannot be completed unless ABB Lummus Global, Inc. ("Lummus"), an affiliated company, and the Oil, Gas and Petrochemical ("OGP") division of ABB of which Lummus is a part can be sold.[5] ABB Limited's financial viability depends on putting Lummus into a condition to be sold, which it will not be if burdened with asbestos liabilities unless those asbestos liabilities are defined and funded. Mr. Hess testified on cross-examination that if Lummus were sold ABB Limited agreed it would retain responsibility for Lummus's liabilities. Lummus's value with its liabilities would be zero. NT 4/24/03 at 272 (Hess). In addition, Mr. Hess testified on direct that as long as there are asbestos liabilities within the ABB group, its credit facility would run out and it could not repay debt. NT 4/24/03 at 245–46 (Hess).

Further, Lummus and Basic, Inc., another nondebtor affiliate, share some insurance with U.S. ABB that is part of the funding for CE's Asbestos PI Trust (postpetition trust). The Plan Proponents assert that if lawsuits against Basic and Lummus continue, the shared insurance may not be available to fund CE's Plan.

Prepetition insurance settlements with CE represent a stream of payments of $90,500,000. NT 5/2/03 at 142 (Zilly).[6] There is $198 million in aggregate unexhausted excess insurance policy limits but certain carriers dispute coverage. Id. at 148, Brett Affidavit. CE's books reflect only a conservative $148.7 million in light of possible insurer insolvencies or timing issues with respect to collectability. Id.

CE also has environmental liabilities [7] the most significant of which are in con-

support of the Plan. He was retained by the Future Claimants' Representative, David Austern. NT 5/2/03 at 60–61 (Radecki). Although the restructuring programs ABB has undergone (three in the past six years) have been expensive for ABB, they have not been unsuccessful, although ABB has not realized all the benefits it was seeking. NT 5/2/03 at 90–91 (Radecki). At the time of Mr. Radecki's testimony, ABB had just reported first quarter numbers showing significant growth in EBIT margins and revenues for its core businesses. Id. at 91. It also seemed to be gaining market share in some of its core businesses. Id. at 105. Mr. Radecki testified that ABB's business plan was aggressive but that it was beginning to show progress, particularly with respect to its core businesses. NT 5/2/03 at 77 (Radecki).

5. The banks determined which ABB Limited businesses had to be sold and the OGP business was one of them but cannot be sold as long as Lummus has asbestos exposure. See, e.g., NT 4/.24/03 at 250 (Hess).

6. Pamela Zilly, senior managing director at the Blackstone Group, testified as an expert as to CE's liquidation value, among other things.

7. Effective July 1, 1999, all of CE's stock was transferred to a joint venture known as ABB

Alstom Power. The joint venture was between CE's ultimate parent, ABB, and Alstom. CE retained all of it asbestos liabilities but the company was conveyed with its liabilities to the joint venture. There were two indemnities related to those liabilities. In a 1999 Transfer Agreement, U.S. ABB agreed to reimburse CE for the uninsured portion of asbestos-related claims open and pending as of June 30, 1999. CE undertook to indemnify and defend U.S. ABB for any CE asbestos liability claim asserted against U.S. ABB after June 30, 1999. In May, 2000, the joint venture was dissolved due to business differences between U.S. ABB and Alstom including a dispute over liability for asbestos-related claims against CE. U.S. ABB therefore purchased CE's stock but due to an intervening transfer in late December, 1999, of what was CE's fossil power generating assets to a subsidiary of the joint venture now owned by Alstom, CE's only remaining operating asset is certain real property in Windsor, Connecticut, although CE retains some cash and has some insurance assets. It also had a note in the range of $400 million on which U.S. ABB was obligated. NT 4/24/03 at 229 (Hess). As part of the dissolution of the joint venture, U.S. ABB agreed to indemnify the Alstom entities for asbestos-related claims asserted against them based on their prior affiliation with CE or ownership of CE's assets. CE's

nection with a kyanite mine in Georgia and a former nuclear components facility in Connecticut. The Disclosure Statement states that the environmental liabilities are in excess of $100 million, and Pamela Zilly, senior managing director at the Blackstone Group, testified that $224 million was an estimate of a possible upper range of the cost in light of the existence of numerous regulatory bodies involved and a general lack of consensus with respect to the responsible party. NT 5/2/03 at 153 (Zilly). The cleanup cost at the Georgia site is approximately $200,000 per year. CE is not seeking to discharge the remediation liability but under the Plan U.S. ABB will assume responsibility for it. US ABB will also assume remediation at CE's Connecticut site where CE used to manufacture nuclear components for the Navy and the Atomic Energy Commission and later produced commercial nuclear fuel.

In October 2002, CE began initial discussions with Joseph F. Rice regarding the broad economic parameters of a plan. Mr. Rice is a plaintiffs' attorney with over 20 years experience in asbestos litigation. He is a member of the Manville Trust Advisory Committee ("TAC"), served as claimants' representative in the Shook & Fletcher bankruptcy, and served on claimants' negotiating committees in the Pittsburgh Corning and Babcock & Wilcox bankruptcies, among others. Mr. Rice also has experience with prepackaged plans of reorganization for debtors with asbestos liabilities, including Shook & Fletcher and J.T. Thorpe. NT 5/1/03 at 38–39 (Rice).

The first discussion with Mr. Rice concerning a CE bankruptcy took place on October 22 and 23 of 2002 in Zurich, Switzerland. At the meeting, representatives of ABB provided Mr. Rice with a presentation on ABB's financial condition and historic transactions between ABB and CE. Mr. Rice then put forth a proposed structure for the reorganization of CE. The structure was based on what had been done in Shook & Fletcher in which Mr. Rice had actively participated and to which most of the insurers in that case eventually agreed. NT 5/1/03 at 40–41 (Rice).

By the end of October 22, 2002, the parties had arrived at a basic structure of a prepackaged plan. This basic structure was memorialized in a Memorandum of Agreement ("MOA") initialed on the morning of October 23, 2002, by representatives of the parties in interest. The basic structure of the deal was: (1) a prepetition settlement trust funded by half the value of CE, now referred to as the CE Settlement Trust; (2) a bankruptcy trust funded by the other half of the value of CE and augmented by a cash and stock contribution from ABB, known as the postpetition Asbestos PI Trust; and (3) the release of certain parties, including ABB, U.S. ABB, and Alstom. In addition, it was critical to ABB that Lummus and Basic be included in the § 524(g) injunction. NT 4/24/03 at 245–47 (Hess). As noted earlier, Mr. Hess testified that as long as asbestos liability exists within the ABB group in the United States, ABB would continue to have the problems it has had; i.e., when its current credit facility runs out there is still more than $2 billion due for repayment at the end of 2003 that it will not be able to repay and for which it cannot obtain more financing due to asbestos exposure. NT 4/24/03 at 245–46 (Hess). Mr. Hess testified that Lummus must be included in the § 524(g) injunction because, in order for ABB to pay its debt, it must divest certain busi-

---

current business consists of leasing real property in Windsor, Connecticut, and conducting remediation with respect to that property.

nesses, the OGP division, of which Lummus is a part, being one of them. *Id.* at 246–47 (Hess). The sale of the OGP business has been dictated by ABB's banks, *id.* at 247 (Hess), and the OGP business cannot be sold as long as Lummus has asbestos liability. *Id.* at 247 (Hess). Furthermore, shareholders will not contribute as long as there is asbestos exposure. *Id.* The same analysis applies to Basic's asbestos problems. Basic and Lummus handled asbestos related materials and are defending claims that are not purely derivative of their corporate relationship with Debtor.[8] Basic faces approximately 3,500 suits at this time. Pending against Lummus are currently approximately 7,600 cases.

It was decided at the meeting in Zurich in October of 2002 that Mr. Rice would negotiate a prepetition settlement structure that he could recommend to his clients and that he thought would be acceptable to other law firms representing current asbestos claimants. The purpose was to buy immediate peace from the thousands of asbestos lawsuits (pending and potential) against CE so that CE could file a prepackaged bankruptcy plan rather than face a freefall bankruptcy. It was anticipated that the other law firms would independently evaluate the merits of the proposed deal and that they would be free to negotiate with CE on behalf of their own clients. It was also agreed that an independent, fully funded future claimants' representative would have to be selected to represent the interests of the unknown asbestos personal injury claimants. NT 5/1/03 at 87 (Rice). Mr. Rice was determined to be a good choice to serve as facilitator with other asbestos plaintiffs' firms due to his experience with asbestos

mass tort cases and his familiarity with the plaintiffs' bar.

After the MOA was executed negotiations proceeded in earnest and resulted in a Master Settlement Agreement ("MSA") and related agreements. The terms of the MSA were resolved in large part by November 14, 2002. Mr. Austern was asked to serve as the Futures Representative. He and/or his professionals had become involved and were beginning due diligence. After the MSA was formalized Mr. Austern began active involvement in the negotiation of the Plan. His concern was the amount available for future claimants.

Mr. Rice testified about the MSA. He testified that he worked closely with John Dickhoff, president of CVCSC who provided data covering the period September 2002 through November 14, 2002, concerning the volume of cases that had been presented to CE. Mr. Dickhoff provided this information categorized by law firm, by jurisdiction, and, to the best of his ability, by disease. Mr. Dickhoff also provided Mr. Rice with historical settlement data for each law firm in each jurisdiction as it changed over a period of time, as well as substantial additional data that was summarized in chart form at trial. Mr. Rice analyzed that data and was comfortable that with the volume of cases represented to be in existence as of November 14th, in conjunction with the historical settlement averages, there was enough money in the trust even if the figures were off by 21 to 25 percent. The CE Settlement Trust provided for three categories of distribution, depending upon how long a claimant's case had been pending resolution. Category 1 claimants would be paid 95 percent, Category 2 claimants 85 percent, and Category 3 claimants 75 percent

---

**8.** It is the creditors with non-derivative claims who may not have been solicited with respect to this Plan.

of their settlement. There was a safe-guard to the sufficiency of funding in that Category 3 cases would be paid half of the 75 percent they were to receive. These Category 3 claimants recognized the possibility that they would not get the other 37½ percent, because it was set for a proration payment of monies available after the payment of claims in Category 1 and Category 2. However, it became clear that the data provided by Mr. Dickhoff was not accurate. Although Mr. Rice had anticipated, due to his experience in the mass tort asbestos area, that the data would be off by approximately 25 percent, it turned out that there were two or three major law firms that had cases that met the definition of eligible claimant under the MSA and were in jurisdictions that had high historical payment averages. Once that volume of 25,000 or 30,000 additional claimants was added in, the payments as originally agreed upon could not be made. Accordingly, Mr. Rice spoke with counsel for ABB Limited and others, including an attorney who represents a substantial number of New York asbestos claimants (15,000 to 20,000), one who represents only mesothelioma cases and others. There were a total of four law firms and they reached an agreement with ABB Limited's counsel. As a result, a Category 4 was proposed that would benefit from additional financial contribution for ABB Limited in the amount of approximately $30 million. These claimants would also have the right to come into the MSA but, as Mr. Rice put it, only on the back end. The Category 4 claimants agreed to take less than 37½ percent. They could not dilute the 37½ percent that was going to the Category 3s inasmuch as those claimants had agreed to the MSA on the basis of the first 37½ percent. This agreement was memorialized in the supplemental MSA. In order to know the amount of money needed for Categories 1, 2, and 3 before Category 4 could be paid, deadlines had to be imposed. This was necessary to avoid diluting the 37 ½ percent. NT 5/1/03 at 72–76 (Rice).[9] The deadline chosen was November 14, 2002, which was the day the terms were finalized.

The CE Settlement Trust consisted of a cash deposit of $5 million, a promissory note from Debtor payable to the CE Settlement Trust in the principal amount of approximately $100 million (the "CE Note"), assignment of a loan agreement

---

9. Category 1 claimants were those who were to receive 95 cents on the dollar. These were the claimants it was feared might force an involuntary inasmuch as they either had judgments or settlements and had been waiting some time for their money.

Category 2 claimants were people who were not quite as far in the process but had done everything they were supposed to do. That is, they had entered into a settlement agreement, or agreed to a resolution process. They had presented their information, and the Debtor had promised payment in a specific amount to a specific plaintiff, for a specific disease, to be paid on a specific date. These claimants would receive 85 cents on the dollar. The payment date was after November 14 but within 90 to 120 days.

The Category 3 claimants were to get 75 percent but only 37½ percent through the prepetition CE Settlement Trust. They understood that the other half would be paid only if and when payments to Category 1 and Category 2 claimants were completed. *Id.* at 72. Once the problem noted in the text came to light (i.e., that Mr. Dickhoff's information was not completely accurate), Category 4 was created.

The proposal was to pay all claimants the fixed percentage of their entitlement through the assets that were to go into the prepetition CE Settlement Trust. These claimants would then look to the § 524(g) plan trust for the other part of their compensation. The portions to be paid through the plan trust were the so-called "stub" claims. These claimants understood that payment of the stub would be made only if there were funds to pay it. NT 5/1/03 at 71–72 (Rice).

between U.S. ABB as borrower and Debtor as lender under which U.S. ABB agreed to pay $402 million upon demand by Debtor (the "US ABB Loan") and a guaranty by ABB Limited of the CE Note and the U.S. ABB Loan.

The agreement reached by the parties that was eventually announced in January of 2003 was among ABB Limited, U.S. ABB and CE on one hand and Mr. Austern and Mr. Rice on the other hand. Pursuant to the MSA the CE Settlement Trust was established and was funded by CE prepetition on or about November 22, 2002. The consideration for this contribution by CE was an agreement that Mr. Rice, who was designated as the Claimants' Representative in letters to asbestos claimants regarding voting on the prepetition plan,[10] would submit the proposal to asbestos personal injury claimants who would be eligible to participate and the attorneys for those claimants. Mr. Rice would also recommend to claimants and their counsel that they accept the MSA. Mr. Rice testified that the other plaintiffs' lawyers would not simply rely on his suggestion that their clients sign on to the MSA. NT 5/1/03 at 55 (Rice). He himself represented only his own clients. *Id.* at 53–54 (Rice).

Mr. Rice testified that both he and John Dickhoff, president of CVCSC initiated discussions with law firms who had clients with asbestos claims against Debtor in order to sign people up for the MSA. NT 5/1/03 at 78 (Rice). When a law firm informed Mr. Rice that it was interested in the MSA, Mr. Rice would receive information from the firm regarding its volume of cases that met eligibility requirements and information regarding the historical average, or values, by disease. He would then get the same type of information from CVCSC and to the extent there were discrepancies, he, the law firm, and Mr. Dickhoff would work to resolve the differences. *Id.* Where there were already settlement agreements in existence the same agreements were used but the time frame was expanded. *Id.* at 79. Mr. Dickhoff, however, made the ultimate decisions.

Participation in the M.S.A. was offered to all prepetition claimants. It was not conditioned upon a favorable vote on the proposed plan—neither claimants' lawyers nor their clients were required to vote for the outline of the Plan but merely asked to indicate a non-binding approval of the outline. The MSA provided that counsel for claimants would undertake, consistent with their ethical duties and in light of the individual circumstances of the each claimant, to recommend to each claimant acceptance of the prepackaged Plan. There was no requirement that claimants signing the MSA vote in favor of the Plan, and it was fully expected that they would exercise their own independent judgment.[11] To further explain the process, CE and U.S. ABB held a meeting in Houston, Texas, on

---

10. The letter which is CE Exhibit 22 was sent to known asbestos claimants who were being asked to sign on to the M.S.A. § and the Plan prepetition. Mr. Rice was asked why he signed as "Claimants' Representative" when he sent letters to claimants but did not use that designation when communicating with counsel. He did not have an answer. However, he testified that "[k]nowing the asbestos plaintiffs' bar", no claimants would assume that he was representing their interests. NT 5/1/03 at 138 (Rice). *See also id.* at 137–38.

11. Mr. Rice testified that the M.S.A. § provided that by signing it the claimant was "committing to support the bankruptcy plan of CE, if it is consistent with the negotiated memorandum of understanding." NT 5/1/03 at 84 (Rice). However, the testimony and evidence at trial did *not* establish that those executing the M.S.A. § were bound in any way to vote in favor of the Plan prepetition.

February 12, 2003. There were approximately 75 to 100 plaintiffs' attorneys present and they were told that signing up for the MSA did not require them to vote in favor of the Plan. Similarly, to vote for the Plan prepetition the claimant did not have to execute the MSA. NT 5/2/03 at 245 (Dickhoff).

The purpose of the CE Settlement Trust was to compensate people who already had claims in the tort system or on file with CE and to provide CE with a reprieve from litigation. In order to do that, a cutoff had to be established to prevent a huge influx of claims once the MSA was set up. As Mr. Rice testified, if you announce that you have a fund of money, everyone will come forward with claims in an attempt to obtain part of that fund. Since a percentage was to be paid through the CE Settlement Trust, there had to be fixed data regarding the volume of cases and their historical values. NT 5/1/03 at 63 (Rice). All claimants were made the offer to participate in the MSA. More than 13,000 claimants executed the MSA. No advance notice of the cutoff was provided to any plaintiffs' counsel. I find that selection of November 14 was fair to all claimants.

The MSA was amended on or about January 29, 2003, to offer additional holders of asbestos-related personal injury claims the opportunity to enter into the MSA agreement through February 20, 2003, and to thereby qualify to receive payments under the MSA. This offer remained outstanding through February 20, 2003, in accordance with the terms of the amendment. The chapter 11 was filed on February 17, 2003. The bankruptcy was filed earlier than originally anticipated due to pressures on the parent, ABB. Since the filing of the bankruptcy, the Debtor has entered into numerous Adoption Agreements whereby the claimants executing the Adoption Agreements will become participants in the CE Settlement Trust.

In 1983, CE and its primary insurers entered into a settlement agreement under which Travelers Indemnity Company exclusively handled CE's asbestos claims. In 1989, CE and Travelers entered into an agreement under which CE became solely responsible for handling its asbestos claims. Since then, CE has delegated claims handling responsibility to Connecticut Valley Claims Service Company ("CVCSC"). The procedures under the MSA were the same procedures CE had used, at least since 1986 when Mr. Dickhoff began working for CVCSC. NT 5/2/03 at 216, 220 (Dickhoff). This involves review of evidence of exposure to a CE product and medical and diagnostic criteria. I credit Mr. Dickhoff's testimony that CVCSC evaluated and continues to evaluate each claim and its supporting documentation before paying any creditor. Once the CE Settlement Trust was established, CE paid the claims of those who qualified and agreed to the MSA. These payments continued postpetition but a certain portion of each claim, the "stub" claim, remains unpaid. Those with stub claims were eligible to vote on the Plan.

The CE Settlement Trust was created on November 22, 2002, for the purpose of holding assets and to process and pay those qualified to receive payments under the terms of the MSA and who executed releases and agreed to other covenants required by the MSA. As noted earlier, the CE Settlement Trust was funded with three principal assets of CE: assignment of a note from U.S. ABB, a CE promissory note for approximately $100 million, and $5 million in cash. This constituted approximately half of CE's assets. NT 5/1/03 at 68 (Rice).

In November 2002, the process of conducting an extensive due diligence review

of CE and its business was commenced. First, financial due diligence was conducted by an investment banker, Loreto Tersigni. Mr. Tersigni was retained by several asbestos plaintiffs' law firms, including Baron & Budd, to conduct due diligence into ABB's financial condition and the nature of the financial transactions that had taken place between ABB and CE. Mr. Tersigni has worked for claimants or claimants' committees in numerous asbestos bankruptcies and had provided advice to the National Association of Attorneys General in the tobacco industry litigation. Mr. Rice would have retained Mr. Tersigni himself but he had already been retained by another. Mr. Tresigni was hired to examine Debtor's financial condition and events prepetition to identify possible fraudulent transfers. NT 5/1/03 at 88 (Rice). However, Mr. Rice got the benefit of Mr. Tresigni's due diligence and relied on Mr. Tersigni and others. *Id.* at 47, 88 (Rice). Mr. Rice verified data he had been given regarding CE. *Id.* at 44–45 (Rice).

Mr. Austern, Futures Representative, testified that he did his own due diligence and had sufficient time to conduct it. NT 5/1/03 at 283 (Austern). Scott Gilbert of Gilbert Heintz & Randolph LLP testified that his firm examined insurance assets for the Futures Representative. Mr. Austern charged Mr. Gilbert's firm with reviewing the insurance assets to determine whether they were equal to or in excess of the dollar estimate provided by the debtor. NT 5/1/03 at 239 (Gilbert). His firm reviewed the insurance policies with respect to settlement agreements and the agreements themselves, and interviewed policyholders as to their understanding of the settlement agreements. The firm obtained information on policy consumption in order to understand what available coverage remained. NT 5/1/03 at 238–39 (Gilbert). Mr. Austern testified that he hired Mr. Gilbert because he was "well aware of the specialized nature of what [he] does and the specialized nature of insurance" and that he was not aware of any other firm that had the same reputation for competence in the insurance practice field. NT 5/1/03 at 284 (Austern).

Mr. Austern also retained Joseph Radecki, an investment banker with CIBC World Markets Corp., to investigate the financial condition of ABB and its ability to contribute to the Asbestos PI Trust. NT 5/1/03 at 285 (Austern).

Mr. Austern retained FTI Consulting to examine fraudulent transfer issues in light of the fact that so much money moved in and out of CE over a relatively short period of time. NT 5/1/03 at 285 (Austern). Such an examination was also necessary, in Mr. Austern's view, because of the length of ABB's involvement with CE. *Id.* Mr. Austern wanted to know if the corporate veil could be pierced so that asbestos claimants could look to levels higher than CE in the corporate structure. *Id.* His advisors informed him that potential fraudulent transfer claims were worth on their face between $63 million and $538 million. *Id.* at 295 (Austern). This estimate, however, did not include an assessment of collectability nor of the costs of litigation. *Id.* at 295–96 (Austern). With respect to piercing the corporate veil, although there were some overlapping directors and a central treasury, there were separate books and records, separate businesses and separate employees. NT 5/1/03 at 296–97 (Austern). Mr. Austern concluded that proving the case would be very difficult and extremely expensive and arguably any judgment would be uncollectable. *Id.* at 297. To be clear, there were, for purposes of this opinion, two different categories of possible fraudulent conveyances: one involved the money that went to the CE Settlement Trust prepetition and the other was related to the joint venture with

Alstom. *See, e.g.,* NT 5/2/03 at 179–81 (Zilly). Insofar as the contributions to the CE Settlement Trust and the unwinding of the Alstom joint venture might give rise to fraudulent transfers, Ms. Zilly of The Blackstone Group, CE's financial advisor, testified that the amount of money that ABB put into CE was so great that setting aside fraudulent transfers, assuming any could be proven, would produce no benefit for the estate. I credit the testimony. In Ms. Zilly's opinion, none of the possible fraudulent conveyances would be worth pursuing. *Id.* at 181.[12] I find that the evidence supports her view. Based on this testimony regarding the unlikelihood of a recovery on the fraudulent transfer claims, I find for Plan confirmation purposes that there is no value to those potential claims.[13]

Ms. Zilly testified that she participated and assisted in the due diligence efforts of Mr. Tresigni for the asbestos claimants, Mr. Austern, and ABB's financial advisor, Lazard Freres. NT 5/2/03 at 135. Mr. Hess testified that ABB Limited cooperated fully throughout the due diligence process; it opened its books and gave access to all documents that were requested. NT 4/24/03 at 239–40 (Hess). He testified that

there were "absolutely no limits" on the information that would be made available. *Id.* at 240 (Hess). As ABB Limited's general counsel testified, there was an endless series of requests for information which substantially burdened ABB personnel. *Id.* at 239 (Hess).

Mr. Austern retained the law firm of Swidler Berlin as bankruptcy counsel to advise him on commercial matters. NT 5/1/03 at 298 (Austern). As a result of his due diligence Mr. Austern insisted on enhancements to ABB Limited's contribution to the plan. To satisfy him, guarantees of ABB Limited's obligations in connection with the Plan were obtained from valuable subsidiaries as provided in the ABB Credit Support Term Sheet. *See* NT 4/24/03 at 248 (Hess); NT 5/1/03 at 342–43 (Austern); NT 5/2/03 at 14–15 (Austern); NT 5/2/03 at 80, 83, 87, 144–16 (Radecki). It was further agreed among the parties that the applicability of the § 524(g) channeling injunction would be revisited in the event that ABB defaulted on its financial commitments to the Plan. NT 4/24/03 at 249 (Hess). In addition, ABB Limited gave limited consent to jurisdiction in the United States. That is, if there is an uncured

---

**12.** Ms. Zilly testified that she

> looked at ... all of the supporting documentation, the financial records, the legal documents and the valuations associated with the formation of the joint venture, as well as the unwinding of the joint venture and evaluations that were available as of those points in time. And we also looked at the contributions that U.S. ABB has made to Combustion Engineering over that period of time, and again, based on the facts and circumstances of those transactions, based on our assessment as to the reasonableness of the valuations prepared at that time and based on the fact that really the contributions made by U.S. ABB in our view overwhelm any possible dollar amount of claims in conjunction with, again, the practicalities of bringing those suits, which

> again I have personal experience with. That is why we did not include any possible recovery from any possible fraudulent conveyance actions.

NT 5/2/03 at 181 (Zilly).

**13.** The $400 million that went into the CE Settlement Trust was not considered as coming back into the estate in a chapter 7 by Ms. Zilly in her liquidation analysis. NT 5/2/03 at 172–73. She testified that "it would be very difficult to get those monies back and that any sort of a preference action would not be sustainable and would take an extraordinary length of time and ultimately not recover value under a liquidation recovery." *Id.* at 173. Although not a lawyer, Ms. Zilly based her conclusion on experiences she has had in other cases where such actions have been unsuccessful. *Id.* at 174.

financial default by ABB Limited in connection with its financial obligations under the plan, ABB Limited consents to the jurisdiction of this Court for purposes of dealing with the consequences of that default. Hrg. Tr. 5/1/03 at 32–33 (Statement of David Bernick, counsel to U.S. ABB).

Other enhancements to the Plan included the following:

(1) ABB Limited will provide $100 million more in additional payments from 2006 through 2011, of which $50 million is contingent upon ABB's performance over a four-year period of time.[14] The other $50 million is not contingent.

(2) Credit support for all of the ABB $350 million contributions was developed.

(3) Originally, the Asbestos PI Trust was going to receive the CE stock but that was changed to a $20 million note convertible to 80 percent of CE stock upon[15] successful completion of the environmental remediation. *See* Term Sheet attached as Exhibit A to Plan, Hrg. Exh. 1; NT 5/1/03 at 300–01 (Austern).

(4) US ABB agreed to assume responsibility for remediation of one of the sites for which CE has environmental liability. Originally, the Asbestos PI Trust had the responsibility. NT 5/1/03 at 301 (Austern). The cost of remediation was estimated at $100 million. *Id.*

(5) ABB Limited and U.S. ABB agreed that some potential indemnities that could have been channeled to the Asbestos PI Trust would not be.

(6) If Lummus is sold, the Asbestos PI Trust will receive $5 million from that transaction. NT 5/1/03 at 300–01 (Austern).

(7) ABB also agreed to accelerate the $250 million in payments to which it originally agreed. The payment period was shortened from five to three years. NT 5/1/03 at 301–02 (Austern). This development puts money into the Asbestos PI Trust sooner and reduces the risk attendant to ABB Limited's financial status.

(8) ABB Limited also agreed to guarantees[16] by certain subsidiaries. Mr. Austern testified that these guarantees were satisfactory to him. NT 5/2/03 at 14–15 (Austern). *See also* NT 5/2/03 at 78–87 (Radecki) (the amount Mr. Austern negotiated was as much as could be obtained) and the credit support agreement[17] which

14. The $100 million depends on the EBIT margin. NT 4/24/03 at 244 (Hess).

15. In essence, the Term Sheet says the $20M secured note is convertible to 80 percent of the outstanding equity securities at the option of the holder at a price equal to the greater of the then outstanding principal amount of the note or 80 percent of the then fair market value of the assets of the reorganized Debtor determined at that time by an independent appraiser and as if the note did not encumber the Connecticut site.

16. Documentation of the guarantees was being drawn up by May 2, 2003. NT 5/2/03 at 94 (Radecki).

17. Mr. Austern testified that he relied on opinions given him by CIBC to support his conclusion that the credit support provided in connection with the ABB Limited guarantees reduced the risk of nonpayment by ABB Limited. NT 5/1/30 at 333 (Austern). Joseph J. Radecki of CIBC World Markets Corp. testified. He is an investment banker and a managing director in its leverage finance group. He also heads the firm's financial restructuring and distress advisory practice. NT 5/2/03 at 60 (Radecki). His testimony confirmed that of Mr. Austern; i.e., he testified that "the amount of proceeds that had been negotiated by the futures representatives was as much as I believe the negotiations would bear, were largely as much as [he] believed that other finance parties of ABB would allow under the current circumstances and that the credit support ... agreement underlying that stream of payments took care of the risks". NT 5/2/03 at 87 (Radecki).

included the guarantees mitigated risk.[18]

As to asbestos claims, Plan distribution operates through a CE Trust Distribution Procedure ("TDP"). Under the Plan, the Trust Distribution Procedures are essentially the same as those historically used by CVCSC. NT 5/2/03 at 220 (Dickhoff). The CE TDP is similar to the Manville TDP with respect to the medical issues but under the CE TDP a claimant must identify his job site; under the Manville TDP there is a job site table. NT 5/1/03 at 360 (Austern). The Plan trust is funded, in part, by assignment of insurance proceeds.

The insurers were not part of the prepetition negotiations and objected to the Plan on the basis that their rights under their policies and/or settlement agreements were affected without their consent through Plan provisions that require assignment of the rights to receive proceeds under the policies to the Asbestos PI Trust. Mr. Brett testified, however, that the TDP in this case reflects the practice that CVCSC used and insurers were aware of that practice. NT 5/12/03 at 45 (Brett). Although the TDPs do not provide for insurers to have a say in what claims are paid (the Asbestos PI Trust trustees and claims reviewers decide), the insurers did not have such input prepetition. *Id.* at 46 (Brett). The same situation exists with respect to the CE Settlement Trust. That is, the protocol for payment of CE Settlement Trust claims is the same as what CVCSC had been doing and various insurers had reviewed the process in the past. *Id.* at 48 (Brett). Excess carriers with high levels of excess coverage may not have monitored the process prepetition because they would not yet have been affected. *Id.* at 49 (Brett). Further, the protocol and criteria for the MSA are again substantially the same. *Id.* at 73 (Brett).[19] I find that the Plan does not change whatever rights the insurers had prepetition regarding payment of claims.

At the hearing on May 13, 2003, counsel for the Committee represented that there had been changes to the TDP as the result of the Committee's demands. One was the creation of a 60–day window after the Effective Date (later increased to a 70–day window) for current claimants who had not been included in the MSA to file claims. Those who do will receive accelerated payment from the Plan. The other change is a reversal in the payment order of the stub

---

**18.** Under the ABB Credit Support Agreement, ABB retains the right to sell ABB Turbo Systems Holding Limited and if that occurs, the obligations under the ABB Turbo Systems guarantee shall automatically cease whether satisfied or outstanding. The Credit Support Agreement further provides that ABB shall have no obligation to replace the ABB Turbo Systems guarantee or otherwise satisfy any obligations of Turbo Systems. NT 5/2/03 at 13–14 (Austern)(Turbo Systems is owned by ABB Limited and has produced approximately $60 to $66 million of cash flow on a U.S. currency basis between 1999 and 2002 with no debt.) NT 5/2/03 at 85 (Radecki). ABB Participation AB is an intermediate holding company that owns 100 percent of the stock of ABB Nordon. ABB Nordon is one of the largest operating units of ABB Limited, accounts for roughly forty percent of the general ABB groups' revenues, and is worth approxi-

mately a billion dollars. *Id.* at 86. Thus, even if Turbo is sold, there is sufficient value in Nordon to maintain the integrity of the Credit Support Agreement and therefore of ABB Limited's contribution. Mr. Austern testified he relied on Mr. Radecki's advise regarding this and was satisfied. NT 5/2/03 at 14–15 (Austern).

**19.** The insurers' rights are not affected by the CE Settlement Trust. There were no insurance contributions to the CE Settlement Trust; the funding of the CE Settlement Trust came from CE assets. During the course of the trial on the Disclosure Statement and Plan it was agreed by the Plan Proponents that the insurers' contractual and legal rights would not be affected by the terms of the Plan.

claimants, in other words, as modified, the first to be paid will be the settled administrative claims, then Category 3, then Category 2, then Category 1. The purpose of paying in reverse order from that originally proposed is to equalize distributions. That is, stub claimants who got the highest amount (95 percent) under the MSA will get the last distribution from the Plan and those who received the 37½ percent will be paid first.[20] Hrg. Tr. 5/13/02 at 261–62 (Remarks of Joseph Frank, Esquire, for the Committee). As now provided in the Plan, therefore, the TDP gives known claimants who have not yet settled with CE the ability to file a claim within +a 70–day window and to be paid with priority. It also pays the stub claims in reverse order; i.e., those with the largest stub claims get paid before those with the smallest stub claims, thereby making more equal the combined CE Settlement Trust and Plan distributions among the creditors.

The insurers who are party to settlement agreements with CE, whereby they have agreed to the amount they will pay toward asbestos claims, objected to the plan because the Plan originally provided that indemnity agreements under the settlements will be channeled to the Asbestos PI Trust which would not be sufficiently funded to pay the indemnities. The insurers with indemnity agreements argue that they should at least be able to vote on the plan.

The Plan provides that the only impaired creditors are those holding Asbestos PI Trust claims and Non–Debtor Affiliate intercompany Claims and holders of equity interests. The insurers insist that they are impaired[21] but the Plan has been modified to make clear that *nothing* impairs their rights. Because their rights are unimpaired, they are not entitled to vote and there is no occasion to address in the Plan or adjudicate in this confirmation process non-core issues such as potential breach by Debtor that might lead to a claim by insurers. The insurers insist that the Plan provision(s) regarding assignment of insurance proceeds to the Asbestos PI Trust and the way that asbestos claims will be examined by the Asbestos PI Trust impairs the insurers' rights. It was agreed that the rights of insurers shall be determined under the subject insurance policies or subject insurance agreements as applicable and nothing in the Plan is to affect that. The confirmation order will so provide. Therefore, this issue is moot because, as now modified, the Plan leaves the insurers unimpaired and, if and when their indemnity claims are allowed, they will be paid 100 percent in either Class 3 or Class 4. They will not be channeled to the Asbestos PI Trust. Moreover, the testimony and evidence at trial established that (a) very few insurers have indemnity agreements with Debtors and (b) it is unlikely that those indemnities will ever come into play. For example, Mr. Brett testified that an indemnity agreement between INA

---

20. The modifications to the Plan also deleted the requirement that a claimant's first exposure had to before 1972. Hrg. Tr. 5/12/03 at 262 (Frank). I find that the modification to the order of payment materially enhances the distribution to Category 3, leaves Category 2 unaffected and represents a de minimis, non-material change to Category 1 whose remaining five percent claim will likely receive little through the Plan in any case.

21. The insurers may have claims against the estate to the extent actions taken in the future trigger events under the policies or insurance settlement agreements. Whether this will ever occur cannot be known at this point but what is certain is that certain insurers hold contingent unliquidated claims which makes them creditors of this estate. As long as their rights are not impaired, they are not entitled to vote on the Plan and the Plan is confirmable with respect to this issue.

(variously referred to as ACE and Century Indemnity) and Basic [22] was over ten years old and no demand to pay the indemnity had yet arisen. NT 5/12/03 at 73 (Brett).

In summary, there is no litigation pending that would implicate the indemnities.[23] Therefore, the potential for recovery on these indemnities is purely speculative at this point. In the event that there is litigation that kicks the indemnities into play, the merits of the claims will be addressed at that time.

The insurers contend that the Plan is not feasible in that there will be insufficient funds to pay the indemnities, which I have valued at zero. I find that the Plan is feasible.

The contributions to the Plan are as follows:

From CE:

its right to the proceeds under its remaining insurance policies and settlement agreements covering asbestos personal injury claims, the face amount of which exceeds $320 million;[24] all of its cash, which is approximately $51 million as well as its future excess cash flows in accordance with the Term Sheet attached to the Plan; and a $20 million secured note, convertible at any time by the Asbestos PI Trust into 80 percent of the outstanding equity securities of the reorganized CE.

ABB Limited is contributing, on its behalf and on behalf of the other Non–Debtor Affiliates:

30,298,913 shares of its stock, which Ms. Zilly testified was worth in excess of $82 million, NT 5/2/03 at 156 (Zilly); a financial commitment to pay $250 million to the Asbestos PI Trust from 2004 through 2006, with up to $100 million of additional payments from 2006 through 2011, half of which is contingent on ABB's future financial performance; guarantees of that financial commitment by various ABB affiliates as provided in the ABB Credit Support Term Sheet; and the release of all claims and interest of the ABB group in insurance covering CE's asbestos personal injury claims.

US ABB is contributing:

an indemnification of all of CE's environmental liabilities, which has been esti-

---

22. In 1992 Basic and INA entered into a settlement which was structured so that INA paid Basic a sum of money in exchange for releases and for dismissal of some lawsuits that were pending at the time. NT 5/12/03 at 59 (Brett).

23. References to three state court lawsuits referred to as *Wise I, Wise II,* and *Cashman,* allegedly implicate the indemnities. As explained on the record, I value the indemnity claims at zero for Plan confirmation purposes. The three actions are against the insurers directly, alleging, *inter alia,* a conspiracy to commit unfair settlement practices on statutory grounds. NT 4/24/03 at 302 (Rice). They do not involve the contractual indemnities. Moreover, only Travelers was involved in settling claims for CE until CVCSC took over. Travelers does not have an indemnity. There cannot be a conspiracy of one.

24. Mr. Brett testified that included in CE's contributions is $92 million due under settlement agreements with insurers. NT 5/2/03 at 276 (Brett). There is between $198 million and $200 million in total insurance coverage. *Id.* at 280 ($200 million is the face amounts of unexhausted products liability coverage by solvent insurers and is available for Asbestos PI Trust claims under policies that don't contain asbestos related exclusion). There is $92 million due but not paid from insurers with respect to pre–1977 claims. NT 5/2/03 at 287 (Brett). The primary insurers in this regard are Cigna (also referred to at trial as ACE or Century Indemnity) and CNA. NT 5/12/03 at 63 (Brett). Mr. Austern testified that "major portions" of the insurance asset are recoverable. NT 5/1/03 at 324 (Austern). Insurance proceeds is the "second largest asset" coming into the Asbestos PI Trust. NT 5/1/03 at 321 (Austern).

mated to be worth at least $100 million; a release of its indemnification rights against CE for asbestos claims asserted against U.S. ABB after June 30, 1999; and if Lummus is sold within 18 months of the Plan's Effective Date, an additional $5 million to the Asbestos PI Trust and $5 million to the CE Settlement Trust; a $5 million Limited Carrier Indemnity.[25]

The contributions of Lummus and Basic are:

the release and assignment to the Asbestos PI Trust of all of their rights to proceeds under insurance covering asbestos personal injury claims, including certain policies shared with CE. In addition, U.S. ABB is contributing almost $38 million on account of the asbestos claims attributable to Basic and Lummus.

Although there was some confusion at trial, I find that the evidence and testimony support a finding that post-confirmation the Reorganized Debtor will have $51 million available to pay administrative and Class 3 and Class 4 claims. The $51 million will remain in the Debtor until these claims are paid in full. The Term Sheet was amended to be consistent with the Plan in this regard. *See* Hrg. Tr. 5/12/03 at 263–64. Any balance will go into the Asbestos PI Trust except for $3 million which will remain with the Reorganized Debtor. Hrg. Tr. 5/2/03 at 323–26 (colloquy). Moreover, U.S. ABB has guaranteed $5 million of CE's obligation regarding the indemnities. In exchange for its contributions to the Asbestos PI Trust, CE will be released from and indemnified against all Asbestos PI Trust Claims, which claims will be channeled under § 524(g) of the Bankruptcy Code to the Asbestos PI Trust. Likewise, the ABB parties contributing to the Plan, their affiliates and certain other parties will also receive general releases and indemnification for Asbestos PI Trust Claims and certain other claims, as well as the benefits of a channeling injunction (the "Asbestos PI Channeling Injunction") with respect to Asbestos PI Trust Claims. These actions further enhance feasibility.

Since the bankruptcy was filed, Debtor has settled issues with some of its insurers, thereby resolving some objections. Debtor and Liberty Mutual settled their dispute with respect to the plan and the settlement was approved by order of this court dated May 13, 2003, at docket no. 780. Andritz, Inc., now known as Andritz AG also settled with Debtor, as approved by this court on May 23, 2003. Docket no. 862.

 One of the issues that arose at the Plan confirmation hearing revolves around the $20 million fee being paid to Mr. Rice by ABB for his services in assisting in getting claimants to sign onto the MSA.[26] The Certain Cancer Claimants (CCC) allege that he cannot serve as Claimants' Representative because he has a conflict of interest and further that he must disgorge the $20 million or any part thereof he has received.[27] Mr. Brett testi-

---

25. The indemnity claims are in Class 4 of the Plan except to the extent that they are unclassified administrative claims or workers' compensation claims, in which case they will be in Class 3. *See* Remarks of David Bernick, Theodore Freedman, counsel for Asea Brown Boveri, Inc., 5/12/03 at 260.

26. Mr. Rice testified that he was not involved with negotiation of the prepackaged Plan. NT

5/1/03 at 165 (Rice). He was involved in the Babcock and Wilcox case and the BMW case. The TDP in this case was modeled on the TDPs in those cases. Mr. Rice was not involved in adjustment of those TDPs to the instant case. NT 5/1/03 at 165–66 (Rice).

27. The implication in designating someone as a "Claimants' Representative" is that the person in that position is disinterested and work-

fied that neither U.S. ABB nor CE approached Mr. Rice. He did not know whether ABB Limited had done so. Brett Deposition 3/26/03 at 47–48. It is ABB Limited that agreed to pay Mr. Rice's fee. NT 5/1/03 at 59 (Rice).[28] The fee was structured as a success fee to be paid in installments. *Id.* At least one payment has been made. Although Debtor did not pay Mr. Rice, the issue of whether he has a conflict of interest that tainted the vote was contested at trial. I find that the prepetition vote was not tainted under the unusual circumstances of this case.[29] Although Mr. Rice was representing his own clients, his role with respect to the prepetition events was to contact and inform other law firms representing asbestos personal injury claimants with respect to the Master Settlement Agreement and to communicate offers of settlement to CVCSC which was handling claims against CE. Mr.

Rice was chosen for this role because he is well acquainted with the plaintiff's bar and knew who the players are. Mr. Hess confirmed Mr. Rice's testimony. Mr. Hess testified that it was his understanding that the asbestos litigation was controlled by several plaintiffs' lawyers and that it was necessary to find someone who could coordinate negotiations with representatives of the asbestos plaintiffs' bar. NT 4/24/03 at 235 (Hess). Because the banks were not willing to provide financing absent evidence that a realistic solution for Debtor's asbestos liabilities was in the offing there was not time to negotiate with between 15 and 25 law firms. *Id.* Mr. Rice was chosen to focus on coordinating negotiations with the various asbestos plaintiffs' law firms. *Id.* at 236.[30]

Mr. Rice testified that the asbestos plaintiffs' bar would not take his word with respect to the merits of the Master Settle-

---

ing for the interests of all claimants. Mr. Rice clearly is not disinterested. He feels that he represented only his own tort clients while simultaneously accepting $20 million from an entity with the opposite stake in the proceedings. To the extent that U.S. ABB is contributing to his fee, he is further conflicted because U.S. ABB is a creditor by virtue of CE's indemnity. *See* note 7, *supra.* US ABB is also a debtor to CE by virtue of the $402 million note and indemnity. Even if Mr. Rice's conduct failed to meet appropriate ethical standards such that the fee would be subject to disgorgement, the $20 million would not come into the Debtor's estate because it was not paid by the Debtor.

28. The Disclosure Statement provides at ¶ 6.8 that ABB Limited and U.S. ABB are paying the $20 million success fee.

29. There was some concern expressed at trial that Mr. Rice would be chosen to be on the TAC for this Debtor. In fact, he had been named to the TAC, Hrg. Tr. 5/12/03 at 306–07 (Remarks of Theodore Freedman, counsel for ABB Limited), but has been replaced by Russell Budd, one of his attorneys in this case. To the extent that the Plan or any Plan docu-

ments purport to leave open the possibility that Mr. Rice will be a member of the TAC, the provision is expressly disallowed. Mr. Rice wears too many hats with respect to this Debtor and its creditors. He represents asbestos victims with claims in this case. He has an actual conflict of interest in that his fee is being paid by an entity that is the (indirect) parent of the entity he was suing prepetition (CE). He represents parties who are suing insurers, the result of which may be to create indemnity claims against the estate. In the latest iteration of the Plan and Plan Documents, Russell Budd, Mr. Rice's counsel, was named as a TAC member in place of Mr. Rice. However, it is likely that Mr. Budd as Mr. Rice's counsel also has a conflict and is not able to serve.

30. There was an objection to Mr. Rice's testimony on the ground that his testimony was "induced by and produced by the improper contingent fee agreement." *See, e.g.,* NT 4.24.03 at 297. However, the findings we make are supported by the record and the objection is overruled. There was no evidence that Mr. Rice's testimony was "tainted" by the fee he is receiving from Debtor's grandparent.

ment Agreement. *See* NT 5/1/03 at 55 (Rice). He testified that he did not represent future claimants. *Id.* He testified that it was never "suggested" that he represented anyone other than his own clients, *id.*, even though there are documents and the Disclosure Statement that refer to him as "Claimants' Representative". Nonetheless, Mr. Rice is being paid both by ABB and by his clients who have claims against CE and/or who are suing entities in the ABB group. The Disclosure Statement as submitted for approval by this Court revealed that Mr. Rice is to receive $20 million as a "success fee" from ABB Limited and U.S. ABB. The Disclosure Statement states that Mr. Rice is "Claimants' Representative", *see* Glossary of Terms as Modified Through the Seventh Technical Modifications through June 4, 2003, Dkt. no. 892, but, he testified that he represented only his own clients in the negotiations leading to the MSA. NT 5/1/03 at 54–54 (Rice). Obviously, Debtor, ABB Limited and U.S. ABB believed Mr. Rice's role to be much broader but no application to retain him has been filed, nor could he be retained as a Claimants' Representative, *inter alia*, because he has a conflict of interest as to the estate, due to his employment and payment by Debtor's parent which is a creditor of Debtor. Thus, he could not comply with Fed. R.Bankr.P.2014.

I find that Mr. Rice has an actual conflict of interest in this case. He is being paid $20 million by the parent of an entity he is suing. In addition, he has tort clients who have claims against Debtor and/or another ABB related entity and he has contingency fee agreements with those clients who will be or have been paid through the CE Settlement Trust, NT 5/1/03 at 111–12 (Rice), and/or by the As-

bestos PI Trust. At a minimum, he is required to obtain the informed consent of his tort clients to the arrangement but he testified that he does not have written waivers from any of his clients.[31] Mr. Rice testified that he sent a letter to his own clients and to all law firms participating in the MSA disclosing the fee. NT 5/1/03 at 105 (Rice). He also testified, however, that he did not notify his own clients or obtain waivers or authorization with respect to the fee before or after entering into the agreement with ABB but that he received communications from clients "during the course of the process providing ... support and powers of attorney after disclosure of the fee situation...." NT 5/1/03 at 115 (Rice).

This Court has equitable power to fashion a remedy. Having failed to obtain waivers, Mr. Rice and firm are prohibited from collecting any fees from tort clients as the result of distributions they have received or will receive through the CE Settlement Trust or through the Asbestos PI Trust unless, within 60 days he informs his clients, in writing, of the existence and nature of his conflict, obtains written waivers from those clients, and certifies to this Court that he has or has not obtained the waivers. If he does not obtain waivers, he must return all fees to those clients not waiving the conflict and is precluded from collecting further fees with respect to them. He must also refer all non-waiving clients to other counsel within the 60 day period prescribed herein. Mr. Rice may not collect any fees going forward with respect to this matter until he obtains waivers.

I note that Mr. Rice also represents the plaintiffs in *Wise I*, *Wise II* and *Cashman*. The *Wise* case alleges a statutory cause of action under § 33–11–4 of the West Virgi-

---

**31.** Mr. Rice so testified in deposition although his brief states that he obtained waivers. At trial he confirmed that he had not obtained waivers.

nia Code and a cause of action alleging conspiracy to violate that section against insurers. This portion of the West Virginia Code concerns unfair methods of competition and unfair or deceptive practices. The complaint asserts that the insurers intentionally misrepresented facts or insurance policy provisions regarding coverage and failed to adopt and implement reasonable standards for prompt investigation of claims. NT 3/24/03 at 303 (Rice). It is also alleged in the state court action that the insurers refused to pay claims without investigation. *Id.* at 303–04. The plaintiffs are those who have resolved claims against Debtor and now seek recovery from the insurers. None of the plaintiffs in the *Wise* case are creditors of Debtor. The plaintiffs in the *Cashman* case are those who have resolved claims for non-malignant disease. At the time of his testimony Mr. Rice had not determined whether any of them had signed a release or waiver with respect to a later malignant disease. With that caveat, he testified that the *Cashman* plaintiffs were not creditors of this estate. *Id.* at 301. Debtor is not named as a defendant in either case. *Id.* at 305. Only insurers are named.[32]

I find that the process by which Mr. Rice was identified as the "Claimants'

Representative" at times and not at others and the $20 million fee to be paid is inappropriate but I have no jurisdiction to compel repayment or to prevent payment by ABB Limited. However, to the extent the Plan or Plan Documents provide that Mr. Rice or his counsel in this case has any part in the Asbestos PI Trust, TDP, or TAC, that provision is expressly disallowed. I note that the latest TDP provides that nothing prevents the TAC from contracting with third parties to provide services to the Asbestos PI Trust. Neither the TDP nor the TAC identify those parties. The Plan Confirmation Order will provide that this provision is not to be construed to allow Mr. Rice or his firm or his counsel to participate in any way with respect to the operation of the Asbestos PI Trust through serving as a Trustee or on the TAC.

I find that the solicitation process prepetition was fair and designed to reach all known CE claimants. Debtor solicited votes through counsel. Inasmuch as most were represented by counsel, NT 5/1/03 at 212–13 (Rice),[33] I find that there was no prejudice created by the misrepresentation that Mr. Rice was Claimants' Representative.

32. *Wise I*, Exhibit 124 at ¶ 49, specifically limits the action to provisions of the West Virginia statute concerning unfair claim settlement practices and specifically disavows any action that arise out of the underlying asbestos personal injury claims. The asbestos claims are covered by the policies. The allegations in *Wise II* and *Cashman* are similar in that the claims are limited to unfair claims settlement practices. *See* Exhibit 122, ¶ 30. The plaintiffs in *Cashman* disavow any actions with respect to underlying asbestos personal injury and wrongful death, etc. The asbestos claims are those which would be indemnified under the settlements but are expressly excluded from the *Wise* and *Cashman* complaints. The indemnities that CE gave under the settlements with insurers are for claims arising under the policies which were

released through the settlements. Those claims are not at issue in *Wise* or *Cashman*. The insurers' argument seems to be that, nonetheless, someone may raise the issue thereby triggering the indemnity. Of course, anyone can sue for anything. The question is, whether the plaintiff can win, something which is improbable. Therefore, the indemnities are valued at zero for purposes of plan voting. One agreement requires CE to indemnify the insurer for contribution claims but the allegations in the *Wise* and *Cashman* cases do not assert a claim for contribution.

33. Mr. Rice testified that he was not aware of any unrepresented asbestos claimants but people are being diagnosed every day. NT 5/1/03 at 212.

Wendy Cappola testified for the Plan Proponents. She is director of operations and technology for Trumbull Associates which prepetition was the noticing and balloting agent in this case. Approximately 350 plaintiffs' counsel were sent an e-mail with a letter from Debtor's counsel asking how they preferred to receive solicitation materials for their clients. NT 5/2/03 at 267–68 (Cappola). Trumbull attempted to contact by telephone those firms that did not respond to the e-mail. *Id.* at 268. Both master and individual ballots were sent out. Master ballots required a valid power of attorney. *Id.*[34] Law firms that did not provide a valid power of attorney were contacted. *See also* note 31, *supra*. If a master ballot was sent in that did not have a power of attorney, CVCSC or Trumbull would contact counsel to send the power of attorney. CVCSC would make the contact if it had a record of the power of attorney for a particular firm.[35] When the dust cleared and all valid powers of attorney were accounted for and all votes tabulated, the vote was overwhelmingly in favor of the Plan (97.2 percent in favor).[36] Once the ballots were received

they were reviewed for eligibility.[37] Of the non-participants in the MSA there were 13,651 votes in favor of the Plan and 3,241 against out of 111,000 proper votes. NT 5/12/03 at 240 (Dickhoff). There were 125,000 votes not counted since they were not accompanied with powers of attorney. Of those, 45,000 rejected the Plan. *Id.* at 241. Thus, sufficient votes in favor of the Plan were received.

Certain of the releases and injunctions in the Plan are contested. The Plan purports to release nondebtors which are also non-contributors to the Plan and to release independent claims of Basic and Lummus. Specifically, the ABB parties, their affiliates and certain other parties are to receive general releases and indemnification for Asbestos PI Trust claims and certain other claims as well as the benefits of a § 524(g) channeling injunction. ABB's OGP companies include entities owned directly or indirectly by CE and although CE does not believe that any of them would be liable for Asbestos PI Trust claims, the Plan provides that these businesses and their purchaser are "Asbestos

**34.** Some claimants had powers of attorney on file with CVCSC and Trumbull and CVCSC would exchange information. If a claimant had a power of attorney on file with CVCSC, CVCSC would so inform Trumbull. NT 5/2/03 at 269 (Cappola).

**35.** There was an issue with respect to ballots sent in by the Goldberg Persky firm. Mr. Dickhoff testified that the firm maintained that several thousand ballots were not counted. The firm asserted that the ballots should have been counted and that it had sent powers of attorney to CVCSC. However, there were many claims submitted by the firm that were filed after the November 14, 2002, cutoff date. claims at CVCSC to investigate. The firm had sent in several boxes of claims filed after the November 14, 2002, cutoff date for the MSA. These claims, therefore, were not eligible for inclusion in the MSA. The power of attorney issues was resolved when the pow-

ers of attorney were located. The firm's clients voted against the Plan. NT 5/2/03 at 221–22 (Dickhoff). The recalculation did not change the fact that more than sufficient votes were acceptances.

**36.** The insurers, as noted, contended that the Plan impaired their rights and could not be confirmed as they had not been solicited and had not voted. This objection was cured when the Plan was modified to provide that none of the insurers' rights under either their policies or settlement agreements would be affected by anything in the Plan, Plan documents, or confirmation order.

**37.** A form for powers of attorney was set up. If a master ballot was received with a power of attorney that differed from the form, the power of attorney was sent to Debtors' counsel for review. NT 5/2/03 at 271–72 (Cappola).

Protected Parties" and "Released Parties" under the Plan. In 2002 an affiliate of Debtor and indirect subsidiary of ABB sold ABB's structured finance business to certain direct and indirect subsidiaries of the General Electric Company. These purchasers are concerned about being sued for CE's asbestos liabilities. The likelihood that they would have any liability for asbestos related to CE is negligible. The Debtor does not believe that any of the Structured Finance Protected Parties have asbestos liability either but the Plan provides that the channeling injunction covers them as well. Neither the OGP entities nor the Structured Finance Parties are contributors to the Plan.

To the extent an OGP or Structured Finance Part is sued for CE's liability, they are covered by the § 524(g) injunction. Their own, direct, non-CE related liability, if any, is not within § 524(g) and is not protected by the injunction.

Alstom is a proper subject for § 524(g) relief. Alstom is the current owner of CE's former operating assets and is named as a defendant in asbestos suits against CE. Without Alstom in the plan, CE will have to indemnify Alstom.[38]

■ CE and U.S. ABB want the ss524(g) injunction to cover Lummus and Basic for both CE-related claims and for direct claims. The specific requirements of § 524(g) provide, at (4)(A)(i), that, *inter alia,* the injunction can be applied to "bar any action directed against a third party who is identifiable from the terms of such injunction ... *and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debt-*

*or* ", *id.* (emphasis added), if the third party has an ownership of a financial interest in the debtor or its affiliate or predecessor in interest, it was involved in the management of the debtor, its predecessor, or served as officer, director, or employee of the debtor or a related party, it provides insurance to the debtor or a related party or was involved in a transaction changing the debtor's or a related party's corporate structure. *Id.* Basic and Lummus fulfill none of these conditions except the provision of shared insurance with Debtor, applicable to asbestos liabilities. I find that § 524(g) permits shared liabilities to be covered but does not permit the inclusion of direct claims against Lummus and Basic that are not also claims against CE.

Under the Plan, Lummus and Basic are releasing and assigning to the Asbestos PI Trust all proceeds under insurance regarding asbestos coverage, including shared insurance and U.S. ABB is contributing almost $38 million to cover claims attributable to Lummus and Basic. Plan Proponents' Proposed Findings of Fact as of June 4, 2003, at ¶ 72. The amount being contributed by U.S. ABB is apportioned as follows: $28 million for Lummus claims and $9,720,400 for Basic claims. Mr. Austern testified that historically $2.6 million has been paid for Lummus claims and $2.3 million for Basic claims. NT 5/1/03 at 312–13 (Austern). The amounts available to pay claims against Lummus are, in Mr. Austern's words, "hugely higher" than anything he has seen with respect to asbestos trusts and, with respect to Basic, "sort of unheard of". *Id.* at 312. Mr. Austern testified that if the shared insurance does not come into the Asbestos

---

**38.** There was a sale in December of 1999 of what was Debtor's fossil power generating assets to a subsidiary of the joint venture now owned by Alstom. As part of the dissolution of the joint venture, U.S. ABB agreed to indemnify the Alstom entities for asbestos-related claims asserted against Alstom based on prior affiliation with Debtor or ownership of Debtor's assets. Debtor undertook to indemnify and defend U.S. ABB for any CE asbestos liability claim asserted U.S. ABB after June 30, 1999.

PI Trust, the trust runs the risk of not having the use of that insurance. NT 5/1/03 at 313 (Austern). Mr. Austern testified that it is important for the value of the 30 million shares of stock that ABB is contributing to the plan and the $350 million commitment it is making that Lummus be sold and Lummus cannot be sold with asbestos liabilities. NT 5/1/03 at 314 (Austern). With respect to Basic, the $9 million in insurance that is being contributed was characterized by Mr. Austern as a gift because Basic has been out of business. *Id.* Mr. Austern testified, "I don't know how you'd ever get it otherwise." *Id.*

Basic and Lummus are former subsidiaries of CE. Debtor acquired Basic in 1978. *See* Brett Affidavit. By 1970 [39] Debtor had acquired 100 percent of Lummus.[40] In January 1990 U.S. ABB acquired Debtor in a leveraged buyout for $1.6 billion. This was approximately 20 years after CE stopped using asbestos products. In mid–1999 the joint venture with Alstom was formed. Effective July 1, 1999, all of CE's stock was transferred to the joint venture (ABB Alstom Power). There were two indemnities related to liabilities that were transferred to the joint venture. In a 1999 Transfer Agreement, U.S. ABB agreed to reimburse CE for the uninsured portion of asbestos-related claims open and pending as of June 30, 1999. CE undertook to indemnify and de-fend U.S. ABB for any CE asbestos liability claim asserted against U.S. ABB after June 30, 2000.

In May 2000 the joint venture was dissolved due to business differences between U.S. ABB and Alstom, including a dispute over liability for asbestos-related claims against CE. U.S. ABB therefore purchased Debtor's stock but due to an intervening transfer in late December 1999 of what was CE's fossil power generating assets to a subsidiary of the joint venture now owned by Alstóm, CE's only remaining asset is certain real property, some cash, and insurance assets. It also has a note in the range of $400 million on which ABB was obligated. NT 4./24/03 at 229 (Hess). *See also* Brett Affidavit. As part of the dissolution of the joint venture, U.S. ABB agreed to indemnify the Alstom entities for asbestos-related claims asserted against them based on their prior affiliation with Debtor or ownership of Debtor's assets. (Brett Affidavit.) To the extent Lummus and Basic are sued as a result of their prior affiliation with Debtor or other relationship with Debtor as provided in § 524(g)(4), the channeling injunction is properly applied to them. The § 524(g) channeling injunction cannot apply to Basic's and Lummus's independent liabilities, however, as that type of protection for a nondebtor is simply not available under § 524(g).[41]

---

39. The 1970s saw a major decline in electricity consumption and a virtual cessation of demand for new power plants. This resulted in a decline in new orders and cancellation of existing orders for CE's power generation equipment. The impact on CE's sales and operating results was delayed, however, due to the long manufacturing lead times for the equipment. The effect was felt by CE first around 1982 and it has never recovered from what a dramatic downturn resulting in significant losses through the 1980s.

40. In 1930 Debtor and Babcock and Wilcox each acquired a 45 percent interest in ABB Lummus Global, Inc. ("Lummus"). Lummus management retained the remaining ten percent. In 1957 Debtor acquired Babcock and Wilcox's interest in Lummus. By 1970 Debtor had acquired management's shares as well to own 100 percent of Lummus. *See* Brett Affidavit.

41. Plan Proponents at ¶ 126 of the June, 4, 2003, Proposed Findings of Fact refer to § 524(g)(4)(A)(ii)(I) which "contemplates that past or present affiliates for whose operations

Because § 524(g) does not authorize it, the question arises whether § 105(a) permits a stay of proceedings and channeling injunction against Lummus and Basic for their direct liabilities.[42] This question was answered in the affirmative in *In re Dow Corning Corporation*, 280 F.3d 648 (6th Cir.2002). Although not binding on this Court, *Dow Corning* sets out a practical analysis to address situations such as that facing CE. The *Dow Corning* court found that enjoining claims against a nondebtor was appropriate where seven factors were met. These factors are:

(1) there is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the nondebtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

(2) the nondebtor has contributed substantial assets to the reorganization;

(3) the injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;

(4) the impacted class, or classes, has overwhelmingly voted to accept the plan;

(5) the plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction;

(6) the plan provides an opportunity for those claimants who choose not to settle to recover in full and;

(7) the bankruptcy court made a record of specific factual findings that support its conclusions.

280 F.3d at 658.

In this case, I find that factors 1, 2 and 3 are met. Factor 7 is met by these Findings. Without an injunction in favor of Lummus and Basic, the shared insurance would not be available to the Asbestos PI Trust, ABB would not contribute and its subsidiaries would not guarantee ABB's contributions to the Plan and the creditors would not receive the substantial benefits ABB is providing. Lummus and Basic are contributing all of their shared insurance, which provides CE with access to funds without the need to litigate with co-insureds. CE and Lummus shared insurance for the period of 1963 to 1985. From 1952 to 1963 Lummus had its own coverage. *See* NT 5/1/03 at 274 (Gilbert). Continued lawsuits against Basic and Lummus may drain insurance so that it is not available to fund CE's Plan. Mr. Austern testified, with respect to claims against Lummus and Basic, that were a small number of claims coming in over a substantial period of time. NT 5/1/03 at 310–11 (Austern). Further, for both Basic and Lummus, the ratio of claims closed without payment versus claims closed with payment was extraordinary, in Mr. Austern's view. He testified that he had never seen anything like it, in his considerable experience with

---

the debtor may be liable are entitled to" the channeling injunction. However, subsection (I) says "the third party's *ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor*". This section is not on point. The Debtor owned them; they did not own Debtor.

**42.** In *A.H. Robins Co., Inc.*, 880 F.2d 694 (4th Cir.1989), the court found that § 524(e) does

not limit the equitable power of the bankruptcy court to enjoin certain suits against third parties where the injunction was necessary to the plan and to a workable reorganization. Such is the situation here, provided that the Plan Proponents satisfy the factors stated in *In re Dow Corning Corporation*, 280 F.3d 648 (6th Cir.2002).

asbestos cases. *Id.* at 311–12. CE shares an identity of interest with ABB, Lummus and Basic because ABB's need to sell Lummus, *inter alia,* instigated ABB's willingness to contribute to CE's plan funding. There are approximately 7,500 lawsuits naming Non–Debtor Affiliates with CE. Except for certain claims against Basic and Lummus, all of these claims are derivative of CE's alleged asbestos liability. In light of this and the substantial contributions ABB Limited and U.S. ABB are making on behalf of the Non–Debtor Affiliates, they are appropriately included in the channeling injunction, with the exception of independent claims against Basic and Lummus.

Factors 4 and 5 are not clearly established on this record. However, remedial action may cure any defect. Regarding factor 4 (voting), the testimony was that Lummus creditors voted overwhelmingly in favor of confirmation. However, whether creditors who have claims only against Lummus and only against Basic were provided the opportunity to vote is not clear. I recommend that, with respect to factor 4, the District Court provide the Debtor ten days to file an affidavit and produce the affiant at a deposition for cross-examination, then file the transcript, with respect to what, if any, effort was made to identify, notify and solicit votes from creditors with claims only against Lummus and only against Basic; i.e., not shared with CE. If the affidavit does not establish some direct notice to those holding non-derivative claims against Lummus and Basic (or if no affidavit is filed), I recommend that Debtor be required to notify and solicit the direct Lummus and Basic creditors before confirmation is approved. If the affidavit and deposition establish notice, I recommend

that the District Court find that this factor has been met.

Regarding factor 5, the Plan proposes to pay Lummus and Basic claims through the Asbestos PI Trust. I accept Mr. Austern's testimony that there is a separate "pot" or amount of money coming in for CE claims, one for Lummus claims, and one for Basic claims. NT 5/1/03 at 313 (Austern). However, there are no documents filed of record to support that testimony. The $38 million contribution from U.S. ABB is not segregated from other Asbestos PI Trust assets. More significantly, the existing TDP provides that its purpose is to pay *CE* liabilities. There is no TDP regarding payment of Lummus or Basic liabilities. I therefore recommend that the Debtor be provided ten days to file appropriate "TDP type" documentation to establish funds and mechanisms to pay Lummus and Basic direct creditors. That is, the Debtor should be provided an opportunity to file documentation that will (a) establish the fund and the distribution process for Lummus, and (b) establish the fund and distribution process for Basic. If this is done, I recommend that the District Court find this factor has been met.

With respect to factor 6, I accept Mr. Austern's testimony that contribution into these separate pots provides a significant ratio of funds available to pay claims and that the Plan meets this factor as supported by the historical claims experience of Lummus and Basic. *See, e.g.,* NT at 312 (Austern). These amounts are sufficient to provide the opportunity to pay any non-accepting creditor of Lummus or Basic.[43] I recommend withholding confirmation, however, until the Trust documents needed to satisfy factor 5 and the affidavit and deposition transcript in connection factor 4 are filed. If those documents do not es-

---

**43.** I note that the record established that Basic is inactive and appears to be insolvent. Moreover, no one has objected to the proposed treatment of Basic's direct obligations.

tablish some direct notice, then I recommend that Debtor be required to notify and solicit the independent Lummus and Basic creditors before confirmation is approved. If the documents establish the requisite notice, I recommend that the Plan be confirmed.

Thus, although § 105(a) may be available for the intended purpose, the Plan as of June 4, 2003, does not comply with the *Dow Corning* factors. Therefore, the Plan Proponents should be given the opportunity to (1) notify claimants with claims solely against Lummus and Basic of the requested injunction and solicit their votes; if this was already done, provide evidence of that fact;[44] (2) clearly establish the process by which Lummus and Basic creditors will be paid and from what funds (as of now, no funds have been segregated for their payment and no distribution procedures are of record).

Certain Cancer Claimants object to the fact that the funds in the CE Settlement Trust are not included in the Asbestos PI Trust. One Cancer Claimant, Victor Trinchese, filed an adversary complaint alleging a fraudulent transfer to bring the assets of the CE Settlement Trust into the Asbestos PI Trust. Debtor has maintained that the CE Settlement Trust is not an estate asset. Mr. Austern testified that he did not believe that the future claimants would fare as well if the transfer is avoided as they will under the Plan and the Asbestos PI Trust as now constructed. NT 5/1/03 at 366–67 (Austern). The Plan originally proposed to release the CE Settlement Trust from avoidance actions. I refused to permit that release because of the pending Trinchese adversary. I credit Mr. Austern's testimony concerning the futility of pursuing the action for Plan

confirmation purposes, but find that the appropriate resolution of the issue on the merits is to permit the parties to complete the adversary.

There were objections lodged to the Plan asserting that this was a liquidation case and not a reorganization because the Debtor had no business left. Pamela Zilly, senior managing director at the Blackstone Group, testified as an expert as to Debtor's liquidation value, among other things. She testified that Debtor has a continuing real estate business in that it rents out buildings. NT 5/2/03 at 141–42, 172, 193–94 (Zilly). I agree that Debtor is continuing in business post-confirmation. Further, the Bankruptcy Code provides for single-asset bankruptcies.

With respect to the liquidation analysis, Ms. Zilly calculated the total amount available to Debtor minus expenses (including fees and expenses of a trustee and the trustee's professionals), and priority claims. She calculated the amount available under the Plan based on contributions and subtracted expenses there as well. NT 5/2/03 at 139–54; 154–58 (Zilly). She concluded that creditors would fare better under the Plan than in a liquidation. In a liquidation CE would not have the additional insurance contributions it has under the Plan, it would retain the environmental liabilities on property it owns, it would not have the note or stock being contributed by ABB. In chapter 7 assets available to Debtor would be between $210 million and $250 million. NT 5/2/03 at 154 (Zilly). Under the Plan after the effective date CE would be holding $50 million in cash. NT 5/2/03 at 155 (Zilly). Under the Plan assets available to Debtor would be between $640 million and $789 million (after deduc-

---

44. Mr. Dickhoff testified that there were 1,147 votes by Lummus claimants for the

Plan and seven votes against. NT 5/2/03 at 313 (Dickhoff).

tions). NT 5/2/03 at 157 (Zilly).[45] Mr. Austern's testimony was consistent with Ms. Zilly's in that in a chapter 7 or without any bankruptcy at all future claimants would get next to nothing. *See* NT 5/1/03 at 325 (Austern),[46] and find the liquidation alternative is satisfied.

With respect to feasibility of the Asbestos PI Trust and the estimation of future claims, Dr. Timothy Wyant testified for the CCC. He testified that under the CE Settlement Trust the distribution would be about 59 cents on the dollar. NT 5/1/03 at 147 (Wyant). Under the Asbestos PI Trust he testified that future claimants would receive about 18 cents on the dollar. NT 5/12/03 at 146 (Wyant). On cross-examination he testified that he used the methodology that he did because the data were well suited to it. *Id.* at 156 (Wyant). However, he did not explain how or why it was well suited except to say that CE is typical of those to which the method is applied. *Id.* at 151 (Wyant). He noted that the recent surge in asbestos claims filings may be an aberration, *id.* at 147, and so he assumed that the 2001 level would persist through 2004 after which there would be a decline. *Id.* at 149. He calculated the decline by pro rating the claims each year against the Nicholson curve, which is based on epidemiologic studies in the 1980s of occupationally exposed workers, and builds into it how many more cancers will occur from past exposure to asbestos in the work place and how those incidences of disease will decline in the future. NT 5/12/03 at 149 (Wyant). This method focuses only on mesothelioma and lung cancer. *Id.* at 150. He further testified that the majority of future claims would be non-malignancies, *id.* at 152, but that the malignancy curve is used for non-malignant situations because there is no curve for non-malignancies. *Id.* at 177. He testified that a shortfall of even $100 million in postpetition funding would not affect his estimates. *Id.* at 152–53. He further testified that there was no statistical test applied to the propensity ratio for 2001 and no statistical test with respect to the ratio remaining constant, although he did say that "the test in this circumstance is a very specific term of art", *id.* at 171, and that "[t]here was a statistical assessment in that there were clearly defined assumptions there . . . reflecting how actual data is projected into the future." *Id.* at 172.

Nothing in Dr. Wyant's testimony or presented thereafter throughout the course of this trial established what the standard for predicting future claims is or that Dr. Wyant used it. He testified that his methodology for estimating asbestos liabilities has not been published in a peer review journal of statistics, *id.* at 192–93, and he was not aware of any publication in a peer review journal in the field of statistics regarding asbestos estimation. NT 5/12/03 at 193 (Wyant). Dr. Wyant further testified that the Nicholson curve that he applied does not instruct calculation of claims propensity or calculation of a non-malignant ratio. *Id.* at 198 (Wyant). Thus, although his testimony provides food

---

**45.** When asked if she had considered all of CE's assets in her liquidation analysis, Ms. Zilly testified that she had except that "technically missing under a postpetition analysis would be" CE's real estate business going forward which is cash neutral. NT 5/2/03 at 172 (Zilly). By this she meant, in short, that due to the environmental liabilities associated with that real estate, it would not have a value. *Id.* at 190–94.

**46.** Mr. Austern further testified that fraudulent transfer actions would result in ABB stock "being absolutely wiped out" resulting in future claimants' receiving, if not nothing, then substantially less than they will receive under the Plan. NT 5/1/03 at 325 (Austern).

for thought, it is not of probative value for the purpose for which it was elicited.

Dr. Frederick C. Dunbar of the National Economic Research Assistance ("NERA") testified for the Plan Proponents. Dr. Dunbar was asked to evaluate the difference between the prepetition and postpetition payouts testified to by Dr. Wyant. He testified that he computed the statistical error associated with Dr. Wyant's forecast of claims by looking at variances and co-variances of the ratios Dr. Wyant estimated. Those variances were given a weight which gave a measure of the standard error which is also called the "prediction interval". This is a standard test used for statistical forecasting. NT 5/12/03 at 226–27 (Dunbar). With respect to Dr. Wyant's testimony that it is appropriate to use confidence intervals for hypothesis testing, Dr. Dunbar testified that the determination of whether there is a statistical difference between the payouts under the CE Settlement Trust and the Asbestos PI Trust is an example of hypothesis testing. He explained that Dr. Wyant's belief was that the postpetition payouts will be less than 59 cents on the dollar, which statisticians call the "null hypothesis". If Dr. Wyant is correct with respect to the postpetition payouts, the statistical analysis allows him to reject the hypothesis. NT 5/12/03 at 227–28 (Dunbar). However, in order to do that, a confidence interval would have to be used and Dr. Dunbar testified that Dr. Wyant did not calculate a confidence interval for payouts under the prepetition and postpetition trusts. *Id.* at 228. Dr. Dunbar, however, made that calculation which he explained through page 230 of the May 12, 2003, transcript. He testified on cross-examination that the selection of the confidence interval is done by using professional standards and that there are professional and legal standards for confidence intervals. *Id.* at 231–32 (Dunbar). Dr. Dunbar further testified

that Dr. Wyant used a simplified model as compared to the way such forecasts are usually performed. *Id.* at 232. He used, at best, nine parameters whereas NERA uses 70 for a small producer and 2,500 for producers with a number of occupations. *Id.* at 232–33. Because he used so many more parameters, he was able to account for things like, age, jurisdiction and occupation that Dr. Wyant's model did not consider. *Id.* at 233. He also testified that he did not make a ratio based on lung cancer to forecast non-malignant diseases which have a shorter latency period. *Id.* He testified not that any of Dr. Wyant's numbers were wrong, as such, but that there was a question of the probability of "getting another estimate from the same type of data if you re-sample within a range." NT 5/12/03 at 234 (Dunbar). He could not state that a particular point was the most accurate forecast. *Id.* at 235. His conclusion was that there is not a statistically significant difference between the payout under the postpetition trust and the prepetition trust. I find that Dr. Wyant's methodology did not include all factors that it should have included and so should not be accorded much weight. In light of Dr. Wyant's overly simplified model, and in light of the complexities of estimating future claims, I find that Dr. Dunbar's conclusions are more reliable in this context. I accept Dr. Dunbar's and Ms. Zilly's testimony that future claims cannot be accurately estimated. NT 5/2/03 at 157–58 (Zilly)(she did not estimate future claims in chapter 7 or chapter 11 because the estimate is indeterminable both as to number and type and, therefore, amount); Declaration of Frederick C. Dunbar, CE Conf. Hrg. Exhibit 183 at 2. *Cf.* NT 5/2/03 at 230 (Dunbar)(there is no statistically significant difference between the payout under the CE Settlement Trust (prepetition) and the Asbestos PI Trust (postpeti-

tion)). I also find that, based on Ms. Zilly's liquidation analysis and Mr. Austern's testimony, the Plan proposes to pay more for future claims than would be paid under a chapter 7 bankruptcy, a "freefall" bankruptcy, or no bankruptcy at all.

I find that the Plan would be confirmable under 11 U.S.C. § 1129, as modified through June 4, 2003, subject to the recommendations made herein with respect to the fourth and fifth factors of *In re Dow Corning Corporation*, 280 F.3d 648 (6th Cir.2002), i.e., factor 4 (Debtor's filing of affidavit and deposition regarding notice and solicitation of Lummus and Basic creditors), and factor 5 (Debtor's filing of documentation that will establish the funds and the distribution processes for Lummus and Basic). To the extent the rulings are based on issues that are non-core, the District Court will make the final determination.

I find that the Plan complies with the applicable provisions of 11 U.S.C. § 1129(a)(1), and that the Plan Proponents have done so as well, § 1129(a)(2). Further, the Plan has been proposed in good faith and not by any means forbidden by law. *Id.* at (a)(3).

Section 1129(a)(4) provides that

Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of the, the court as reasonable.

I find that the Plan complies with (a)(4). I find that all fees were reasonable except those to Mr. Rice. He is being paid by ABB Limited which is "a person issuing securities . . . under the plan, for services or for costs and expenses in or in connection with the case, or in connection with

the plan and incident to the case. . . ." but the fee is not subject to the approval of this Court.

The Disclosure Statement states that the Reorganized Debtor will be managed by its board and that on or before the Effective Date the Debtor will adopt an amended certificate of incorporation and other corporate documents. Although this information should be in the Plan, 11 U.S.C. § 1129(a)(5)(A)(i), I find that the information in the Disclosure Statement on this point is consistent with the interests of creditors, equity security holders, and public policy, *id.* at (ii), and that the Plan Proponents have disclosed any insiders who will be retained by Reorganized Debtor and the nature of their compensation, *id.* at (B). Subsection (a)(6) regarding regulatory commissions and rate changes is not applicable to this Debtor.

I find that with respect to each impaired class of claims or interests, the holders receive or retain at least what they would receive or retain under a chapter 7. 11 U.S.C. § 1129(a)(7). I refer in particular in this regard to Ms. Zilly's testimony and to that of Dr. Dunbar but note that the overwhelming body of testimony and evidence establish that this Plan is in the best interests of all creditors. Other classes have either accepted the Plan or are not impaired. 11 U.S.C. § 1129(a)(8). Specifically, the insurers' rights under their policies and settlement agreements are not affected by anything in the Plan or Plan Documents, as was explained at trial and clarified by changes to the Plan and Plan Documents.

I find that § 1129(a)(9) and (10) have been complied with and that confirmation is not likely to be followed by liquidation or the need for further reorganization of the Debtor or Reorganized Debtor, *id.* at (a)(11). In fact, the evidence and testimony established that under this Plan

creditors and especially future asbestos claimants will receive more than would be possible in a chapter 7 scenario or if the Debtor had not filed bankruptcy at all.

In addition, I incorporate by reference all the findings in § 7.10 of the Plan. I Retain jurisdiction as provided in the Plan and recommend that the District Court retain jurisdiction as provided in the Plan for all non-core matters.

With respect to § 524(g) I find that the Plan is confirmable except with respect to inclusion of the independent claims of Basic and Lummus in the channeling injunction. However, § 105(a) permits the court to issue a channeling injunction in these circumstances. *See In re Dow Corning Corporation*, 280 F.3d 648 (6th Cir.2002); *A.H. Robins Co., Inc.*, 880 F.2d 694 (4th Cir.1989).

Extension of the channeling injunction under § 524(g) to the OGP entities and the Structured Finance Protected Parties is appropriate only as to liabilities shared with CE.

The Plan is otherwise confirmable in that the § 524(g) injunction is to be implemented in connection with the Asbestos PI Trust which is created pursuant to the Plan. 11 U.S.C. § 524(g)(2).

The Asbestos PI Trust will assume the Debtor's liabilities and the Debtor has been named as defendant in personal injury actions which injuries are alleged to have been caused by the presence of or exposure to asbestos or asbestos containing products, § 524(g)(2)(B)(i)(I). The Asbestos PI Trust is to be funded by securi-

ties of the Debtor and Debtor's obligations to make future payments, § 524(g)(2)(B)(i)(II). Inasmuch as the Asbestos PI Trust will own 80 percent of Debtor's stock upon successful remediation of the contaminated real estate it owns, subsection (g)(2)(B)(i)(III) is met.[47] The Plan further provides that the Asbestos PI Trust will use the assets to pay claims and demands, § 524(g)(2)(B)(i)(IV).

In addition, I find that the Debtor is likely to be subject to substantial future demands for payment arising out of its businesses, especially related to asbestos, 11 U.S.C. § 524(g)(2)(B)(ii)(I), and that the actual amounts, numbers, and timing of those future claims cannot be made. 11 U.S.C. § 524(g)(2)(B)(ii)(II). Further, pursuit of the claims outside the Asbestos PI Trust would drain CE of all resources and exhaust its insurance coverage and would mean that future claimants would receive nothing. 11 U.S.C. § 524(g)(2)(B)(ii)(III).

The terms of the injunction are set out in the Disclosure Statement and the Plan. 11 U.S.C. § 524(g)(2)(B)(ii)(IV). I find that the Disclosure Statement is adequate with respect to the information provided to creditors at the time it was disseminated. All constituencies were represented at trial so the fact that the Plan changes do not affect the sufficiency of the Disclosure Statement. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa).

I further find that those whose claims are to be subject to the Asbestos PI Trust voted in favor of the Plan by more than the requisite 75 percent; in fact, the vote

---

**47.** There was argument at trial that the majority of ABB's stock had to be committed to the Plan but subsection (g)(2)(B)(III) says that the injunction is permissible if the trust "is to own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of (aa) each such debtor; (bb) the parent corporation of each such debt-

or; *or* (cc) a subsidiary ...." Inasmuch as the section is stated in the alternative, the fact that the Asbestos PI Trust is to receive 80 percent of Debtor's stock is sufficient. I note that although the Asbestos PI Trust is also to receive over 30 million shares of ABB stock, there was no evidence that that number of shares is a majority of the voting shares of ABB.

in favor of the Plan was over 97 percent. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb). Further, I find that the implementation mechanisms for the Asbestos PI Trust comply with § 524(g)(2)(B)(ii)(V) in that they provide reasonable assurance that the Asbestos PI Trust will value, and will be in a financial position to pay, present claims and future demands involving similar claims in substantially the same manner.

An appropriate order will be entered.

It is **SO ORDERED.**

## ORDER APPROVING THE DISCLOSURE STATEMENT BUT RECOMMENDING WITHHOLDING OF CONFIRMATION OF THE PLAN OF REORGANIZATION FOR COMBUSTION ENGINEERING FOR TEN DAYS

This matter comes before the Court on the Motion of Combustion Engineering,

Inc., debtor and debtor in possession (the "Debtor" or "CE"), for an order approving the Debtor's Disclosure Statement and confirming Debtor's Proposed Plan.[1] The Court has reviewed the briefs for and against the Plan and the adequacy of the Disclosure Statement and supporting materials filed by all interested parties, has listened to the oral arguments of all interested counsel and reviewed the testimony of witnesses and other evidence admitted at the Confirmation Hearing on April 24 and May 1, 2, 12 and 13, 2003, and heard oral argument of all interested parties with respect to the proposed Technical Modifications and objections to those Technical Modifications on May 23 and 27, and June 3, 2003.[2]

The Court has also reviewed the affidavit of Patricia Cuniff with respect to the mailing of the notice of the Confirmation

1. The Debtor has filed a series of technical modifications to its Plan of Reorganization dated January 19, 2003, and certain of the Plan Documents, since the Petition Date. Specifically the Debtor has filed (i) the Technical Modifications to the Debtor's Plan of Reorganization filed on April 1, 2003; (ii) the Second Technical Modifications to the Debtor's Plan of Reorganization filed on April 22, 2003; (iii) the Third Technical Modifications to the Debtor's Plan of Reorganization filed on April 23, 2003; (iv) the Fourth Technical Modifications to the Debtor's Plan of Reorganization filed on April 24, 2003; (v) the Restated and Supplemental Technical Modifications to the Debtor's Plan of Reorganization filed on May 7, 2003 (the "Restated and Supplemental Technical Modifications"); (vi) the Sixth Technical Modifications to the Debtor's Plan filed on May 13, 2003 (the "Sixth Technical Modifications"); (vii) the Debtor's Final Technical Modifications to the Debtor's Plan of Reorganization filed on June 2, 2003 (the "Seventh Technical Modifications"); and (viii) certain additional Technical Modifications to the Debtor's Plan of Reorganization filed on June 4, 2003 (the "Eighth Technical Modifications") (collectively, the "Technical Modifications"). On June 4, 2003 the Debtor

filed with the Court a Plan of Reorganization as modified through June 4, 2003 together with all Plan Documents as modified through June 4, 2003 which incorporate all operative technical modifications to the Plan and the Plan Documents through June 4, 2003 (the "Modified Plan"). The term "Plan" as used herein means the Modified Plan.

2. Capitalized terms used herein shall have the meanings ascribed to them in the Glossary of Terms for the Plan Documents Pursuant to the Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code for Combustion Engineering, Inc. as modified through June 4, 2003 (the "Glossary"), unless otherwise indicated or defined in the accompanying Memorandum in Support of (I) Approval of Disclosure Statement and Solicitation Procedure and (II) Confirmation of Plan of Reorganization Under Chapter 11 Of The United States Bankruptcy Code For Combustion Engineering, Inc. (the "Memorandum") or herein. Any capitalized term used but not defined herein, or in the Glossary, but that is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules. Such meanings shall be

Hearing, the affidavit of publication by Bridgette Trykoski in *The Wall Street Journal,* National Edition dated March 3, 2003 filed with respect to the publication of notice of the Confirmation Hearing in accordance with the Scheduling Order and concludes that due notice of the Confirmation Hearing was given to all parties in interest.

After due deliberation and sufficient cause appearing therefore, **IT IS HEREBY ORDERED:**

### *General Decrees and Implementation*

1. The Disclosure Statement is hereby approved as containing adequate information in accordance with section 1125 of the Bankruptcy Code.

2. All objections to the Disclosure Statement, other than those withdrawn in writing prior to, or on the record at, the Confirmation Hearing, and other than those in respect of which the Court made rulings during the Confirmation Hearing, are overruled.

3. The Debtor's solicitation of acceptances or rejections of the Plan was in compliance with all applicable requirements of section 1126(b)(1) and (2) of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.

4. The Ballots, in the form transmitted with the Disclosure Statement, are approved in all respects.

5. All objections to confirmation of the Plan, other than those regarding the issuance of a channeling injunction for Lummus and Basic direct claims, those withdrawn in writing prior to, or on the record at, the Confirmation Hearing, and those in respect of which the Court made rulings during the Confirmation Hearing, are overruled.

6. The Plan is not confirmed. Rather, within ten (10) days hereof, CE shall file supplemental information as follows:

(a) an affidavit and deposition transcript of what, if any, effort was made to identify, notify and solicit votes from creditors with claims only against Lummus (i.e., not solely creditors with claims against CE and Lummus) and

(b) an affidavit and deposition transcript of what, if any, effort was made to identify, notify, and solicit votes from creditors with claims only against Basic (i.e., not solely creditors with claims against CE and Basic) and

(c) a document equivalent to a TDP for Lummus that will identify the funds available only for Lummus creditors and the process by which claims will be addressed; and

(d) a document equivalent to a TDP that will identify the funds available only for Basic creditors and the process by which claims will be addressed for Basic.

If the affidavit and deposition transcript substantiate that something more than publication was provided as notice to Lummus' and Basic's direct creditors, then the fourth factor of the analysis in *In re Dow Corning Corporation,* 280 F.3d 648 (6th Cir.2002), will be met and this Court would recommend confirmation. Otherwise, the Court recommends that confirmation be withheld until those creditors are notified and provided the opportunity to vote.

If the TDP-type documents filed for Lummus and Basic establish that a mechanism is in place to pay Lummus and Basic direct creditors, respectively, and the process by which claims will be addressed so that the fifth factor of *Dow Corning* is met, then the Court would recommend confirmation.

equally applicable to both the singular and the plural forms of such terms.

7. In the event that CE satisfies ¶ 6 above so that confirmation can be recommended, then the Court would make the following additional findings:

(A) The Plan, the Plan Documents, as modified through June 4, 2003, including, without limitation, the (i) the Asbestos PI Trust Agreement, (ii) Insurance Assignment Agreement, (iii) the ABB and Non–Debtor Affiliate Settlement Agreement and (iv) the TDP and all amendments, modifications and supplements thereto, including, without limitation, all annexes, exhibits, and schedules thereto, and all terms and conditions thereof, are fair and reasonable and are hereby approved.

(B) All authorized transactions effected by the Debtor during the period from the Petition Date, through and including the Effective Date, are hereby approved, ratified and confirmed.

(C) All payments over which the Court has jurisdiction made or to be made by the Debtor, or by an Entity to the extent, if any, that such Entity issues securities or acquires property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, have been approved by, and are hereby approved pursuant to this Order, or are subject to the further approval of, the Court, as reasonable.

(D) The Plan and its provisions shall be binding on the Debtor, the Released Parties, and any holder of a Claim against or Equity Interest in the Debtor whether or not the Claim or Equity Interest of such creditor or equity security holder or obligation of any party in interest is impaired under the Plan and whether or not such creditor, equity security holder or party in interest has accepted the Plan.

(E) The record of this Confirmation Hearing as supplemented is closed.

(F) Nothing in this Order shall in any way affect the provisions of section 7.11 of the Plan, which provide that "the effective date of the Plan," as used in section 1129 of the Bankruptcy Code, shall not occur and the Plan shall be of no force and effect, until the Effective Date. If the Effective Date does not occur, all Findings of Fact and Conclusions of Law shall be null and void and the Debtor and holders of Claims and Equity Interests shall stand in the same position as if this Order had not been entered.

(G) The provisions of 7.10.1.1 through 7.10.1.7 are incorporated herein and the Court specifically makes the findings stated therein.

***Certain Matters Relating to Implementation of the Plan***

**Certain Corporate Filings; Management of the Reorganized Debtor**

(H) Each of the officers of the Debtor and the Reorganized Debtor is authorized, in accordance with his or her authority under the resolutions of the Board of Directors and By–Laws of the Debtor and the Reorganized Debtor, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate, for and on behalf of the Debtor and the Reorganized Debtor, to effectuate and further evidence the terms and conditions of the Plan and the Plan Documents.

(I) All matters provided for under the Plan, involving the corporate structure of the Debtor or Reorganized Debtor, or any corporate action to be taken by, or required of the Debtor or Reorganized Debtor, shall be deemed to have occurred and be effective as provided in the Plan. This Order constitutes all authority, if any, required by the General Corporation Law of the State of Delaware, as applicable, and

all other applicable business corporation, trust, and other laws of the applicable Governmental Units with respect to the implementation and consummation of the Plan. On and after the Effective Date, the Board of Directors will manage the business and affairs of the Reorganized Debtor.

**Continued Corporate Existence; Vesting of Assets**

(J) Except as otherwise expressly provided in the Plan Documents, on the Effective Date, title to all of the Debtor's assets and properties and interests in property other than those elements of the CE Contribution to be transferred to the Asbestos PI Trust shall vest in the Reorganized Debtor, free and clear of all Claims, Equity Interests, Encumbrances, and other interests, and, except as otherwise expressly provided in the Plan this Order is a judicial determination of discharge of the liabilities of the Debtor.

(K) Except for those actions which may be compromised and settled or transferred to the Asbestos PI Trust pursuant to the Plan and this Order, all actions by the Debtor shall be preserved and retained by the Debtor for enforcement subsequent to the confirmation of the Plan, and on the Effective Date, such actions shall be assigned to, and vested in, the Reorganized Debtor.

(L) Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of any security pursuant to the Plan Documents may not be taxed under any law imposing a stamp tax or similar tax.

**The Asbestos PI Trust**

**The Creation of the Asbestos PI Trust**

(M) On the Effective Date, the Asbestos PI Trust shall be created in accordance with the Plan Documents. On the Effective Date, all right, title and interest in and to the Asbestos PI Trust Assets and any proceeds or causes of action thereunder shall be transferred to, and vested in, the Asbestos PI Trust free and clear of all Claims, interests, Encumbrances and other interests of any Entity without any further action of any Entity. The Asbestos PI Trust and the Trustees are hereby authorized and empowered to receive the Asbestos PI Trust Assets.

**The Appointment of Trustees and Trust Advisory Committee (TAC) Members**

(N) The appointment of Brent Coon and John Cooney as two of the three initial members of the TAC, be, and hereby is, approved. Within ten (10) days hereof, the appropriate parties shall nominate a third member. Effective as of the Effective Date, the initial members of the TAC shall serve as members of the TAC in accordance with the Asbestos PI Trust Agreement. Prior to the Effective Date, the Future Claimants' Representative and the Official Creditors' Committee appointed in the Chapter 11 Case, acting jointly, shall nominate the three initial Trustees of the Asbestos PI Trust in accordance with the Plan. The Bankruptcy Court, after notice and opportunity for hearing, shall appoint the initial Trustees to serve as Trustees of the Asbestos PI Trust in accordance with the Asbestos PI Trust Agreement, effective as of the Effective Date.

**Institution and Maintenance of Legal and Other Proceedings**

(O) As of the Effective Date, and subject to the terms of the Plan the Asbestos PI Trust shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Asbestos PI Trust. The Asbestos PI Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue and resolve all actions aris-

ing from or related to the Asbestos Insurance Rights. The Insurance Contributors shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue and resolve all actions arising from or related to their respective insurance rights to the extent permitted or required by the Insurance Assignment Agreement and the Plan. Within six months of the Effective Date, at the direction of and request of the Asbestos PI Trust, an Insurance Contributor or the Reorganized Debtor, as applicable, shall pursue any Asbestos Insurance Rights for the benefit of and to the fullest extent required by the Asbestos PI Trust, by negotiation or, if necessary, by the initiation of all appropriate and necessary legal action to secure such Asbestos Insurance Rights and shall take such other action as the Asbestos PI Trust may request, including but not limited to granting a security interest in the Asbestos Insurance Rights and commencing a declaratory judgment action to ascertain whether assignment of those Asbestos Insurance Rights constitutes a breach thereof.

**Insurers' Rights**

(P) Notwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan or any of the Plan Documents (including any other provision that purports to be preemptory or supervening), shall in anyway operate to, or have the effect of, impairing the insurers legal, equitable or contractual rights, if any, in any respect. The rights of insurers shall be determined under the Subject Insurance Policies or Subject Insurance Settlement Agreements as applicable.

*Discharge, Releases, and Injunctions*

(Q) Except as specifically provided in the Plan or in this Order the rights afforded in the Plan and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, against the Debtor and the Debtor in Possession, or its assets, properties, or interests in property. Except as otherwise provided in the Plan or in this Order, on the Effective Date all Claims against and Equity Interests in the Debtor and the Debtor in Possession shall be satisfied, discharged, and released in full. Except as otherwise provided in the Plan or this Order, the Reorganized Debtor shall not be responsible for any obligations of the Debtor or the Debtor in Possession except those expressly assumed by the Reorganized Debtor pursuant to the Plan and such settlement agreements relating to objections to confirmation as are expressly approved by the Court. To the full extent provided in the Plan, all Entities shall be precluded and forever barred from asserting against the Asbestos PI Trust and the Asbestos Protected Parties, or their assets, properties, or interests in property any other or further Claims or Demands based upon any act or omission, transaction, or other activity, event, or occurrence of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date, except as expressly provided in the Plan.

(R) Except as provided in the Plan Documents and this Order, the transfer to, vesting in, and assumption by the Asbestos PI Trust of the Asbestos PI Trust Assets and the Asbestos Insurance Assignment as contemplated by the Plan, the ABB and the Non–Debtor Affiliate Settlement Agreement, and the Insurance Assignment Agreement shall, among other things, on the Effective Date (a) discharge the Debtor and the Reorganized Debtor for and in respect of all Asbestos PI Trust Claims

and (b) release and extinguish all obligations and liabilities of the Released Parties for and in respect of all Asbestos PI Trust Claims. On the Effective Date, the Asbestos PI Trust shall assume all Asbestos PI Trust Claims and shall pay the Allowed Asbestos PI Trust Claims in accordance with the TDP. Direct claims against Lummus shall be paid in accordance with the Lummus distribution procedures. Direct claims against Basic shall be paid in accordance with the Basic distribution procedures.

(S) With respect to all Asbestos PI Trust Claims, the entry of the Asbestos PI Channeling Injunction and the Asbestos Insurance Entity Injunction shall stay, enjoin and restrain any Entity from taking any of the actions prohibited by the Asbestos PI Channeling Injunction and the Asbestos Insurance Entity Injunction for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos PI Trust Claim against an Asbestos Protected Party, as set forth in the Asbestos PI Channeling Injunction and the Asbestos Insurance Entity Injunction. In particular, the sole and exclusive remedy on account of Asbestos PI Trust Claims shall be against the Asbestos PI Trust, and no Asbestos PI Trust Claim may be asserted against any Asbestos Protected Party, except as specified in the Asbestos PI Channeling Injunction and the Asbestos Insurance Entity Injunction.

(T) On and after the Effective Date, the Debtor shall be fully and finally discharged of any liability or obligation on a disallowed Claim, and any order creating a disallowed Claim which is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date and shall then be subject to appeal.

(U) Except to the extent released pursuant to the Plan, any rights, claims, or causes of action accruing to the Debtor pursuant to the Bankruptcy Code or pursuant to any statute or legal theory, including any avoidance or recovery actions under sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, any rights to, claims, or causes of action for recovery under any policies of insurance issued to, or on behalf of, or which provides indemnity or liability payments to or on behalf of, the Debtor and any right, claims, and causes of action against third parties related to or arising out of Allowed Claims, except Claims that shall, pursuant to the Plan, be retained and resolved by the Reorganized Debtor, shall, on the Effective Date, be transferred to the Asbestos PI Trust.

(V) Notwithstanding anything to the contrary in this Order, the Plan or the Plan Documents, nothing (including any provision that purports to be preemptory or supervening) shall release Joseph F. Rice, the CE Settlement Trust or its Trustees from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising in law, equity or otherwise.

### The Asbestos PI Channeling Injunction

(W) In connection with the creation of the Asbestos PI Trust and to supplement the injunctive relief of a discharge under section 524 of the Bankruptcy Code, the Asbestos PI Channeling Injunction shall be, and hereby is, issued and approved as of the Effective Date. The Asbestos PI Channeling Injunction applies to Asbestos PI Trust Claims which include CE Asbestos PI Claims. CE Asbestos PI Claims

are defined expansively to include without limitation all direct and indirect contract and tort claims against CE arising out of or related to exposure to asbestos. Pursuant to the Asbestos PI Channeling Injunction, the sole recourse of the holder of an Asbestos PI Trust Claim on account of such Claim shall be to the Asbestos PI Trust pursuant to the provisions of the Asbestos PI Channeling Injunction and the Asbestos PI Trust Distribution Procedures, and such holder shall have no right whatsoever at any time to assert its Asbestos PI Trust Claim against the Debtor, Reorganized Debtor, any other Asbestos Protected Party, or any Settling Asbestos Insurance Company or any property or interest in property of the Debtor, the Reorganized Debtor, any other Asbestos Protected Party or any Settling Asbestos Insurance Company. Without limiting the foregoing, from and after the Effective Date, the Asbestos PI Channeling Injunction shall apply to all present and future holders of Asbestos PI Trust Claims, and all such holders shall be permanently and forever stayed, restrained, and enjoined from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos PI Trust Claims, other than from the Asbestos PI Trust in accordance with the Asbestos PI Channeling Injunction and pursuant to the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures:

(i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Asbestos Protected Party or Settling Asbestos Insurance Company or any property or interests in property of any Asbestos Protected Party or any Settling Asbestos Insurance Company;

(ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Protected Party or Settling Asbestos Insurance Company or any property or interests in property of any Asbestos Protected Party or Settling Asbestos Insurance Company;

(iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Protected Party or Settling Asbestos Insurance Company, or any property or interests in property of any Asbestos Protected Party or Settling Asbestos Insurance Company;

(iv) setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Asbestos Protected Party or Settling Asbestos Insurance Company or any property or interests in property of any Asbestos Protected Party or Settling Asbestos Insurance Company; and

(v) proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Asbestos PI Trust, except in conformity and compliance with the Asbestos PI Trust Agreement and the CE TDP and similar documents or TDPs regarding Lummus and Basic.

(X) Except as otherwise expressly provided in the Plan or the ABB and Non–Debtor Affiliate Settlement Agreement, or this Confirmation Order, nothing contained in the Plan shall constitute or be deemed a waiver of any claim, right, or cause of action that the Debtor, the Reorganized

Debtor, Basic, Lummus, or the Asbestos PI Trust may have against any Entity in connection with or arising out of or related to an Asbestos PI Trust Claim. No holder of a Settled Asbestos Claim that entered into the Master Settlement Agreement or an Adoption Agreement (as defined in the Master Settlement Agreement) shall be enjoined from asserting such Settled Asbestos Claim against the CE Settlement Trust, and no such claim against the CE Settlement Trust shall be released by the Plan or by the ABB and Non–Debtor Affiliate Settlement Agreement.

### The Asbestos Insurance Entity Injunction

(Y) In connection with the creation of the Asbestos PI Trust and to supplement the injunctive relief of a discharge under section 524 of the Bankruptcy Code, the Asbestos Insurance Entity Injunction shall be, and hereby is, issued and approved as of the Effective Date. Pursuant to the Asbestos Insurance Entity Injunction, subject to section 7.4.1 of the Plan, all Entities (not including the Asbestos PI Trust and, to the extent permitted or required under section 7.2.13 of the Plan or the Insurance Assignment Agreement, the Reorganized Debtor and the Insurance Contributors) that have held or asserted, that hold or assert, or that may in the future hold or assert any Claim, Demand, or cause of action (including any Asbestos PI Trust Claim or any Claim or Demand for or respecting any Trust Expenses), against any Asbestos Insurance Entity, based upon, relating to, arising out of, or in any way connected with any Claim, Demand, Asbestos Insurance Rights, Subject Insurance Policies, or Subject Insurance Settlement Agreements whenever and wherever arisen or asserted (including all Claims in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty) shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim, demand, or cause of action, including:

(i) commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such claim, demand, or cause of action against any Asbestos Insurance Entity, or against the property of any Asbestos Insurance Entity, with respect to any such claim, demand, or cause of action;

(ii) enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Insurance Entity, or against the property of any Asbestos Insurance Entity, with respect to any such claim, demand, or cause of action;

(iii) creating, perfecting, or enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Insurance Entity, or the property of any Asbestos Insurance Entity, with respect to any such claim, demand, or cause of action;

(iv) except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation due any Asbestos Insurance Entity, or against the property of any Asbestos Insurance Entity, with respect to any such claim, demand, or cause of action; and

(v) taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents relating to such claim, demand, or cause of action.

*Provided, however,* that (a) the Asbestos Insurance Entity Injunction shall not impair in any way the rights, claims or causes of action described in section 7.3 of the Plan; (b) the Asbestos PI Trust shall have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the Asbestos Insurance Entity Injunction with respect to any Asbestos Insurance Entity upon express written notice to such Asbestos Insurance Entity; and (c) the Asbestos Insurance Entity Injunction is not issued for the benefit of any Asbestos Insurance Entity, and no Asbestos Insurance Entity is a third-party beneficiary of the Asbestos Insurance Entity Injunction.

(Z) Notwithstanding anything to the contrary above, the Asbestos Insurance Entity Injunction shall not enjoin:

(i) the rights of Entities to the treatment accorded them under the Plan, including the rights of Entities with Asbestos PI Trust Claims to assert such Asbestos PI Trust Claims against the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures;

(ii) the rights of Entities to assert any claim, debt, obligation, or liability for payment of Trust Expenses against the Asbestos PI Trust;

(iii) the rights of the Asbestos PI Trust to prosecute any action based on or arising from the Asbestos Insurance Rights;

(iv) the rights of the Reorganized Debtor and the Insurance Contributors for the benefit of the Asbestos PI Trust (but only to the extent permitted or required under section 7.2.13 of the Plan or the Insurance Assignment Agreement) to prosecute any action based on or arising from Asbestos Insurance Rights;

(v) the rights of the Asbestos PI Trust to assert any claim, debt, obligation, or liability for payment against an Asbestos Insurance Entity based on or arising from the Asbestos Insurance Rights;

(vi) the rights of the Reorganized Debtor and the Insurance Contributors for the benefit of the Asbestos PI Trust (but only to the extent permitted or required under section 7.2.13 of the Plan or the Insurance Assignment Agreement) to assert any claim, debt, obligation, or liability for payment against an Asbestos Insurance Entity based on or arising from the Asbestos Insurance Rights; and

(vii) the rights of the Reorganized Debtor and the Insurance Contributors for the benefit of the Asbestos PI Trust (but only to the extent permitted or required under section 7.2.13 of the Plan or the Insurance Assignment Agreement) to assign a cause of action against any Asbestos Insurance Entity to a holder of an Asbestos PI Trust Claim and for such Claimant to assert any claim, debt, obligation, or liability for payment against such Asbestos Insurance Entity.

### Section 346 Injunction

(AA) In accordance with section 346 of the Code, for purposes of any state or local law imposing a tax, income will not be realized by the Debtor or Reorganized Debtor by reason of forgiveness or discharge of indebtedness resulting from the consummation of the Plan. As a result, each state or local taxing authority which was provided with notice of this proceeding is permanently enjoined and restrained, after the Confirmation Date, from commencing, continuing, or taking any act to impose, collect, or recover in any manner any tax against the Denton or Reorganized Debtor arising by reason of the forgiveness or discharge of indebtedness under the Plan.

*Continuation of Prior Stays and Injunctions*

(BB) All of the injunctions and/or automatic stays provided for, in or in connection with the Chapter 11 Case, whether pursuant to section 105, section 362, or any other provision of the Bankruptcy Code or other applicable law, in existence immediately prior to the Confirmation Date shall remain in full force and effect until the injunctions set forth in the Plan become effective, and thereafter if so provided by the Plan, this Order, or by their own terms. In addition, on and after the Confirmation Date, the Reorganized Debtor may seek such further orders as it may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

As to any adversary which has been stayed, any party may move to lift the stay.

(CC) Each of the injunctions contained in the Plan shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan. Notwithstanding anything to the contrary contained in the Plan, all actions in the nature of those to be enjoined by such injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

(DD) Notwithstanding anything to the contrary contained in the Plan, all actions in the nature of those to be enjoined by the injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

*Executory Contracts*

(EE) Except for executory contracts that the Debtor has rejected prior to the Effective Date or designated as being subject to rejection in connection with the Effective Date, as set forth in Article 8 of the Plan, and in accordance with section 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases not previously assumed by the Debtor pursuant to section 365 of the Bankruptcy Code shall be deemed to have been assumed by the Reorganized Debtor on the Effective Date.

*Claims Bar Dates*

**Bar Dates for Administrative Expense Claims**

**Fee Claims—Professional Compensation**

(FF) Professionals or other Entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, § 330, 331, and 503(b) of the Bankruptcy Code (including compensation requested pursuant to section 503(b)(3) and (4) of the Bankruptcy Code by any professional or other Entity for making a substantial contribution in the Chapter 11 Case) must file and serve on the Reorganized Debtor and on such Entities who are designated by the Bankruptcy Rules an application for final allowance of compensation and reimbursement of expenses no later than forty-five (45) days after the last date of the calendar month in which the Effective Date occurs.

**No Bar Date for Ordinary Course Liabilities**

(GG) Holders of Administrative Expense Claims based on obligations incurred by the Debtor in the ordinary course of its business shall not be required to file or serve any request for payment of such Claims and shall be paid in full by the Debtor or performed by the Reorganized Debtor, when due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations, if any.

**Bar Date for Rejection Damage Claims and Non–Asbestos Claims**

(HH)(1) If the rejection of an executory contract or unexpired lease pursuant to section 8.1 of the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claims shall be forever barred and shall not be enforceable against the Debtor or the Reorganized Debtor, its successors or their respective properties unless a proof of Claim is filed on or before the later to occur of: (a) thirty (30) days after the date of entry of an order of the Court approving such rejection or (b) thirty (30) days after service of notice of such rejection, if such rejection occurs by expiration of the time fixed by the Court. Objections to Claims filed pursuant to section 8.1 of the Plan shall be filed with the Court within thirty (30) days of such filing.

(2) Except as otherwise provided in paragraphs (FF) and (GG) and (HH)(1) of this Order, all non-asbestos claims shall be filed within 90 days after the Confirmation Date.

**Retention of Jurisdiction**

(II) Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Case or Plan for which the reference has not been withdrawn to the District Court or (c) that relates to the matters set forth in Article 9 of the Plan.

(JJ) The Asbestos PI Trust shall be subject to the continuing jurisdiction of the Court in accordance with the requirements of section 468B of the IRC and the regulations issued pursuant thereto.

(KK) ABB Limited's limited consent to the jurisdiction of this Court to adjudicate the continued applicability of the channeling injunction in its favor in the event of any uncured default and the consequences of any uncured default is accepted. This Court retains exclusive jurisdiction over ABB Limited for that purpose.

**Miscellaneous**

(LL) On the Confirmation Date, the Debtor shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable it to implement effectively (a) the provisions of the Plan and (b) the creation of the Asbestos PI Trust.

(MM) On the Effective Date, the Unsecured Creditors' Committee, shall be released and discharged as provided in section 11.5 of the Plan. The Reorganized Debtor shall file a Notice that Plan has become effective within ten (10) days after the Effective Date.

(NN) All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtor when due but not later than the Effective Date.

(OO) Except as otherwise expressly provided in the Plan or otherwise Allowed by Final Order of the Court, no interest, penalty, or late charge arising after the Petition Date shall be Allowed on any Claim or Equity Interest.

(PP) No attorneys' fees, Non–Compensatory Damages, penalties, or interest shall be paid with respect to any Claim or Equity Interest except as Allowed by a Final Order of the Court or in accordance with the terms of a TDP.

(QQ) The failure to reference or discuss any particular provision of the Plan in this Order shall have no effect on the validity, binding effect, and enforceability of such provision and such provision shall have the same validity, binding effect, and enforceability as every other provision of the Plan.

(RR) Unless this Order is stayed pending appeal, its reversal or modification shall not affect the validity of the Plan, the Plan Documents, or any other agreement, document, instrument, or action authorized by this Order or under the Plan as to the Debtor, Reorganized Debtor, the Asbestos PI Trust, or any other Entity acting in good faith, whether or not that Entity knows of the appeal.

(SS) The performance of all obligations which shall be due and owing on the Effective Date pursuant to the terms of the Plan shall constitute substantial consummation of the Plan within the meaning of section 1101(2) of the Bankruptcy Code. Notwithstanding any closing of these chapter 11 proceedings, the Debtor, the Reorganized Debtor, the TAC, and the Future Claimants Representative may move, on notice to those Persons on the master service list, to reopen the Chapter 11 Case for the purpose of seeking relief pursuant to the retained jurisdiction of the Bankruptcy Court provided herein, in the Plan or under applicable law.

(TT) As required by the Court's May 13, 2003 Order Granting Debtor's Emergency 9019 Motion for Approval of Settlement Agreement with Liberty Mutual Insurance Company ("Emergency 9019 Motion"), the Plan has been amended by Technical Modification to effectuate and implement paragraphs 4, 7 and 8 of that Settlement Agreement and paragraph 2 of the Assumption and Assignment Agreement attached to the Emergency 9019 Motion.

(UU) As required by the Court's May 23, 2003 Order Approving Agreement Settling (1) Debtor's Motion to Disallow Claims of Andritz Inc. Pursuant to Section 502(e)(1)(B) of the Bankruptcy Code and (2) Objection of Andritz Inc. to Adequacy of Disclosure Statement and Confirmation of Debtor's Plan of Reorganization, the Plan has been amended by Technical Modification so that the Asbestos PI Channeling Injunction and the releases as to the Debtor and Asea Brown Boveri do not apply to Andritz' claims under the Andritz Settlement Agreement and Andritz Settlement Order.

(VV) In the event of any inconsistency between the Plan and any other agreement, instrument, or document intended to implement the provisions of the Plan, the provisions of the Plan shall govern unless otherwise expressly provided for in such agreements, instruments or documents. In the event of any inconsistency between and/or among the Plan and this Confirmation Order, the provisions of this Confirmation Order shall govern. This Confirmation Order shall supersede any orders of the court issued prior to the Effective Date that may be inconsistent herewith.

*Notice of Entry of Confirmation Order, and 70–day Accelerated TDP Claims Process, and General Non–Asbestos Bar Date and Filing of Final Fee and Expense Applications*

(WW) Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c), the Debtor shall be, and hereby is, directed to serve a notice of the (i) the entry of this Order, (ii) the bar date for filing Claims based on the rejection of executory contracts or unexpired leases, (iii) the bar date for filing non-asbestos claims and (iv) the date for filing final applications for compensation and reimbursement of expenses hereunder. The Debtor shall submit a proposed form of notice to the Court within ten (10) days hereof.

(YY) The Debtor shall be, and hereby is, directed to publish the Confirmation Notice and the Notice of the 70–day accelerated TDP claims process once in the *Wall Street Journal* (National Edition) no later than thirty (30) days after the Confirmation Date.

(XX) Within thirty (30) days after the Confirmation Date, the Debtor shall pro-

vide notice to all Class 5 current non-MSA claimants of their opportunity to file a claim within 70 days after the Effective Date (pursuant to § 5.1(b) of the TDP) and to receive accelerated consideration under the TDP.

*Order With Respect to Joseph Rice*

(AAA) Within 60 days of the date of this Order, Mr. Rice shall inform his individual clients and those entities for which he or his firm serves as national coordinating counsel, in writing, of the existence and nature of his conflict, obtain written waivers from those clients, and certify to this Court that he has or has not obtained the waivers. If he does not obtain waivers, he shall return all fees to those clients not waiving the conflict and is precluded from collecting further fees with respect to those clients. He shall refer all non-waiving clients to other counsel within the 60 day period prescribed herein. Mr. Rice shall not collect any fees going forward with respect to this matter until he obtains waivers.

(BBB) Neither this Confirmation Order, the Plan, the TDP, the Asbestos PI Trust Agreement, or any other Plan document shall permit Mr. Rice, his firm, or his counsel to participate in any way with the operation of the Asbestos PI Trust through serving as a Trustee or on the Trust Advisory Committee.

THIS ORDER IS HEREBY DECLARED TO BE IN RECORDABLE FORM AND SHALL BE ACCEPTED BY ANY RECORDING OFFICER FOR FILING AND RECORDING PURPOSES WITHOUT FURTHER OR ADDITIONAL ORDERS, CERTIFICATIONS OR OTHER SUPPORTING DOCUMENTS.

It is **SO ORDERED.**